MONTGOMERY-WARD & CO., Inc., v.
SEWELL et al.

No. 14185.

United States Court of Appeals
Fifth Circuit.

June 26, 1953.

Rehearing Denied Aug. 24, 1953.

464

E. L. Harwell, Rupert R. Harkrider, Abilene, Tex. (Wagstaff, Harwell, Wagstaff & Alvis, Abilene, Tex., of counsel), for appellant.

Larry Scarborough, Beverly Potthoff, Dallas Scarborough, Davis Scarborough, Abilene, Tex. (Scarborough, Yates, Scarborough & Black, Abilene, Tex., of counsel), for appellees.

Before HOLMES, BORAH and RUSSELL, Circuit Judges.

RUSSELL, Circuit Judge.

The only person who could give an accurate account of the manner in which W. M. Sewell, the husband of appellee, Juanita Sewell, sustained his fatal injuries on July 17, 1950, would be the decedent. Since his lips were thereby sealed, plaintiffs, in this suit to recover damages suffered by them as a result of his death, necessarily had to rely solely upon circumstantial evidence to sustain the burden of proving their allegation that defendant's negligence was the proximate cause of Sewell's death. The jury, by its verdict, found that the burden thus cast upon them had been successfully carried. The trial court approved this finding by entering judgment against the alleged *tort-feasor*. Complaining that the court erred in overruling its motions for an instructed verdict and its motion for judgment notwithstanding the verdict, and alternatively, in permitting the jury to apply the doctrine of *res ipsa loquitur* in reaching its verdict, appellant insists that under the facts and applicable jurisprudence it is the duty of this court to reverse the judgment and either render judgment in its favor or remand the case for a new trial.

As an employee of Sunset Motor Lines, Sewell, at the request of appellant, went to its retail store in Big Springs, Texas, to pick up some freight. This freight was in

the basement of the building in a store-room just north of the freight elevator. It consisted of five packages, two boxes of notions weighing a total of 65 pounds and three other packages having a total weight of 49 pounds. The freight was turned over to Sewell by the personnel of appellant's catalog department. Sewell was not seen again by any of the witnesses until after he was fatally injured.

Appellant's store is located on the southeast corner of the intersection of two highways. It fronts north on Highway 80 and the west side is parallel to Highway 87. The freight elevator is located on the west side of the building at the southwest corner, and operates inside a shaft which extends from the basement upward to the top floor. Doors leading into the elevator from the inside of the building are located in the basement, on the ground floor and on the top, or what is referred to as the third, floor. These doors are center biparting fire doors, counterbalanced so that when they are opened half of the door rises and the other half goes down. The only outside entrance to the elevator is at the street level. This entrance is six feet wide and seven feet high, and is guarded by a lattice safety gate which is 5½ feet high. The gate may be raised vertically so that it slides up into the elevator shaft to permit entry to the elevator from the sidewalk. When the gate is closed there is an opening of approximately 1½ feet between the top of the gate and the top of the door opening. The cage of the elevator is 8 feet high, 7½ feet wide and 6¼ feet deep. It has a metal wall on the north and south sides, but is not enclosed on the west and east sides where the fire doors and lattice gate are located. The west side of the elevator shaft is a brick wall. There is a space of 5½ inches between this wall and the west edge of the elevator platform.

On the north wall of the elevator there is a control panel containing an "up" button and a "down" button and an emergency switch. When pressure is asserted against one of the buttons the elevator will move either up or down, depending upon which button is pressed. When the pressure is released the elevator immediately stops whether it is at floor level or not. Buttons inside the building are located on the outside of the elevator shaft at the three levels serviced by it. When the elevator is not otherwise in service, pressure applied to these buttons will cause it to come to the level where the passenger is waiting. If the pressure is released, the elevator will stop where it happens to be at the moment. When the emergency switch on the control panel inside the elevator is turned off the elevator will not operate. There are no buttons to control or call the elevator located on the exterior of the building.

The inside doors and the outside gates are equipped with a mechanical and an electrical lock so that they cannot be opened when the elevator is moving. However for certain loading purposes some of the employees of the store had a method of manipulating mechanism on the outside wall of the elevator whereby they could move it with both the gate and the ground floor fire doors open.

Just above the control panel inside the elevator there is a printed sign at the top of which appears in large block letters the caption "Safety Rules." Below that caption is printed in large letters "For Operation of Freight Elevators" which is followed by a list of 12 safety rules in small but legible print. The first of these is: "No one except an authorized employee may operate this elevator." A similar sign is affixed to the south wall. There was no employee assigned to operate the elevator. A former employee of appellant testified that as far as he knew everybody that came to the store for merchandise could use the elevator and he had never been instructed to the contrary. He had seen various trucking firms use it. On at least two occasions prior to July 17, 1950, employees of Sunset Motor Lines had picked up freight at appellant's catalog department and had been told that they could use the elevator. On one of these occasions when the freight was delivered to the driver it was "sitting over there by the elevator." There is no evidence that Sewell had ever been in the store to pick up freight before or that he

knew of the practice of appellant to permit persons coming there for that purpose to use the elevator. Several employees of the store testified that they did not expressly authorize Sewell to use it. One of these witnesses, Mrs. Wilkinson, stated that, although she did not know he was going to use it, she "had a pretty good idea" that he was.

It is now apparent that Mrs. Wilkinson's "idea" was correct, for the next time Sewell was seen after she left him in the basement, insofar as the record discloses, a motorist "caught a glimpse" of him falling out of the elevator shaft to the sidewalk. As near as the witness could tell Sewell was facing the building as he fell with his feet toward the ground.

A former employee of appellant, Mulkey, testified that he and his helper were on the third floor of the building and he pushed the button to bring the elevator up. When there was no response he looked down through a crack between the floor and the elevator doors and saw that the elevator was in the basement. Shortly thereafter he looked again and found that the elevator was at the street level. In a few minutes he heard the safety gate close. He then reached over and pressed the button. The elevator "kind of jumped and jolted around there a little bit" as it started up. Then Mulkey heard something that sounded like cardboard scraping against the wall. He released the button two or three times, and then pressed it again and brought the elevator up. The scraping sound continued for just a second and then stopped. As he and his helper neared the street level on the descending elevator they saw Sewell lying outside the closed safety gate on the sidewalk. At least two of the packages which Sewell had moved from the basement were on his truck which was double parked near the elevator entrance. The remainder of the packages were on the sidewalk, as was a little two wheel dolly which was apparently used by Sewell in moving them. Sewell had sustained severe injuries to the head and chest from which he died the following day.

An examination of the elevator and its shaft made immediately after the accident disclosed a spot of blood and hair on the west wall of the shaft about 2 feet above the entrance, a streak of blood and hair on the west edge of the elevator platform and spots of blood that had dripped down the safety gate. At that time all the safety devices and locks were working properly. The routine monthly inspection of the elevator was made two days later and it was found to be in proper operating condition. Such an inspection had been made every month by an independent service company for at least eleven months prior to the accident.

The complaint, as amended by a trial amendment, called a supplemental pleading, alleged that the elevator which caused Sewell's death was under the sole operation, management and control of appellant at the time of the accident and thereby relied upon the doctrine of implied negligence to establish the right to recovery. By way of alternative pleading it alleged specific acts of negligence which were, in substance, the failure of appellant to equip the elevator with a device whereby a person using it could be given warning that it was about to be put in motion by someone outside the elevator and the failure to give such warning to Sewell.

Appellant denied that it breached any duty which it owed to Sewell and that the accident was a proximate cause of its negligence, contending that in any event Sewell was guilty of contributory negligence, or, if not, the injuries he sustained were the result of an unavoidable accident.

It is now urged that the rejection of these defenses by the jury is not supported by the evidence because there is no proof that appellant negligently breached any duty which it owed to the decedent. Appellant insists that although Sewell was an invitee on its premises for the purpose of picking up freight, he exceeded his invitation when he made use of the elevator, and thereby became a trespasser, or at most a licensee, as to that instrumentality. Further, even if he were impliedly invited to use the elevator, when he removed the freight therefrom its relation to him as an invitee terminated and if he thereafter re-entered the elevator he did so as a trespasser.

■ We assume for the purpose of this decision that the jury was authorized to find that under the circumstances Sewell was an invitee and used the elevator with implied permission of the defendant. This, however, did not relieve appellees of the burden of proving that appellant was negligent and that such negligence was the proximate cause of the injury. The mere happening of an accident does not raise a presumption of negligence, though both negligence and proximate cause may be proved by circumstantial, as well as by direct, evidence. In this case appellees relied upon circumstantial evidence to establish these essential elements of their claim.

From the evidence there is no way of determining with any degree of certitude whatever the circumstances under which Sewell was killed. Appellant contends that after he closed the safety gate and was outside the building he climbed up on the gate and thrust a portion of his body through the opening between the top of the gate and the structure of the building. At that moment the elevator ascended and crushed him between the west edge of its platform and the west wall of the elevator shaft. Appellees suggest that as he was attempting to unload the packages the elevator suddenly began to move and he was crushed against the wall. The forcing of his body against the safety gate caused the gate to come down as Sewell fell. It is certain, however, that the safety gate was closed when Sewell was injured. Mulkey testified that he heard it slam before he pressed the button and that it was closed when he descended on the elevator. Furthermore, if the gate had been open, Sewell could not have been crushed against the wall, since the gate would have been between him and the wall. The fact that blood dripped down on the gate confirms this view. It is, therefore, physically impossible for the accident to have happened in the manner urged by appellees.

■ There can be no valid contention that if Sewell was outside the elevator and the safety gate was closed his injury could have been caused by appellant's negligence.

If it can be inferred from the circumstances that Sewell was on the elevator at the time, or immediately before, he was injured, as contended by appellees, further inferences would be necessary to support a finding that he fell or was thrown against the wall, was crushed by the elevator and then projected out onto the sidewalk. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved and cannot be presumed. A presumption must rest upon proven facts and cannot be inferred from another presumption. Wells v. Texas Pac. Coal & Oil Co., 140 Tex. 2, 164 S.W.2d 660; Texas & N. O. R. Co. v. Brannen, 140 Tex. 52, 166 S.W.2d 112; McClish v. R. C. Young Feed & Seed Co., Tex.Civ.App., 225 S.W.2d 910; Comet Motor Freight Lines v. Holmes, Tex.Civ.App., 203 S.W.2d 233.

■ In aid of their proof, appellees invoked the doctrine of *res ipsa loquitur*. Over objection of the appellant, the case was submitted to the jury under instructions that permitted it to consider this doctrine in reaching a verdict. *Res ipsa loquitur* is a rule of circumstantial evidence which is applicable to situations where a person is injured without fault on his part by an instrument in the exclusive control of the defendant, and the injury is such that in the ordinary course of things it would not have occurred if the defendant had exercised ordinary care. Existence of these circumstances affords reasonable evidence that the accident arose from want of care. Texas & Pacific Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S.W. 3. It does not appear where the deceased was immediately prior to the injury, whether on or off the elevator. If he was on the elevator and operating it then it can not be said that the defendant was in exclusive control of the instrumentality. Furthermore, the facts are equally consistent with the hypothesis that the injury was caused by the negligence of the deceased, by the negligence of the defendant, or by that of both the deceased and the defendant. In these circumstances there is no proper room for the application of the doctrine of *res ipsa loquitur* and the charge of the court which sub-

mitted this question for the determination of the jury was not authorized.[1] If the deceased was not on the elevator and engaged in its operation there is no permissible basis for any claim of negligence against the defendant. Absent the aid of the rule of *res ipsa loquitur* the plaintiffs' claim is without evidential support.

The burden was upon appellees to establish their right to recover by a preponderance of the evidence. The evidence falls far short of that mark. A jury's verdict must have some reasonable basis in the evidence and may not be sustained if it rests wholly upon surmise and speculation. Since the evidence presented by the record fails to do more than furnish a springboard for conjecture and speculation, the verdict is without any legal basis. It therefore should have been set aside by the Court and judgment rendered for the defendant as prayed. The cause is remanded that this may be done.

Judgment reversed.

See also 98 F.Supp. 245.

1. Bonner v. Texas Co., 5 Cir., 89 F.2d 291; U. S. v. Porter Brothers & Biffle, 5 Cir., 95 F.2d 694; Texas & Pac. Coal Co. v. Kowsikowsiki, supra; Houston Lighting & Power Co. v. Taber, Tex. Civ.App., 221 S.W.2d 339; Allen v. Republic Bldg. Co., Tex.Civ.App., 84 S.W. 2d 506; Tuscany v. U. S. Standard Products Co., Tex.Civ.App., 243 S.W.2d 207; Bonner v. Thompson, Tex.Civ.App., 205 S.W.2d 610.