**UNITED STATES of America,**
**Petitioner-Plaintiff,**

v.

**26.07 ACRES OF LAND, MORE OR LESS, IN THE TOWN OF HEMPSTEAD, COUNTY OF NASSAU, STATE OF NEW YORK, and Jacob Gellman, et al.**

**No. C.P. 86.**

United States District Court
E. D. New York.
Nov. 29, 1954.

Harry T. Dolan, Sp. Asst. to the Atty. Gen., for petitioner-plaintiff, the United States.

Ralph W. Brown, New York City, for defendant New York Tel. Co. (Tract 308), by Kenneth J. Lucey, Brooklyn, Walter K. McFaul, Earle M. Simonson, New York City, of counsel.

Otto M. Buerger, New York City, for defendant Long Island R. Co. (Tract 306).

Fischer & Bodin, New York City, for defendant Sebastian DiPalermo, etc. (Tract 305), by Harry Sabbath Bodin, New York City, of counsel.

Louis E. Greenberg, New York City, for defendant Alex Fedoryszyn (Tract 238).

Hillard Pollack, Woodmere, for defendant, Lena Lipton (Tract 236).

INCH, Chief Judge.

This condemnation proceeding originally involved more than seventy parcels of real estate in the vicinity of Mitchell Field. The Government has taken some of the parcels in fee, and it has taken so-called "avigation easements" over certain other parcels not taken in fee. All the claims have been settled with the exception of the taking of avigation easements over six parcels, namely, tracts numbered 234, 236 and 238, located in a residential zone, and tracts numbered 305, 306 and 308, located in an industrial zone.

Title was vested in the Government by the filing of a declaration of taking on June 26, 1952, so that it is as of that date that the valuation of the avigation easements taken over the above enumerated parcels must be fixed.

The avigation easement appropriated by the Government is described in the declaration of taking as a "perpetual and assignable right of way and easement in and over" the above parcels and others "which lie within a clearance zone having the shape and location described in Schedule 'C' [attached to the declaration of taking] for the establishment and use

of a glide angle plane for the flight of aircraft at an angle of fifty to one with the ground; including the continuing right in the United States to cut timber, remove buildings, and clear the zone of any and all obstructions extending above the glide angle plane and including the right of ingress and egress to and from the land to effect and maintain the necessary clearance; reserving however, to the land owner, and his heirs and assigns, all such rights and privileges as may be used and enjoyed without interfering with or abridgement of the easement acquired by the United States."

After the taking of testimony was completed the Government was permitted, with the consent of all parties, to amend the original declaration of taking by filing an amendment thereto on August 24, 1954 which corrected the description of the easement as to the starting point, but this error in the original description did not materially affect the issue of just compensation or the testimony given by the various witnesses at the trial.

The easement which the Government has taken in the airspace over the defendants' property is in the nature of a runway approach zone for landing and take-off purposes to the northwest-southeast runway at the Army Air Base at Mitchell Field.

The heights at which the easement crosses the various parcels is indicated on a project map (Govt. Exh. No. 1) and are substantially as follows for the parcels involved herein:

Parcel 234 — 32 feet
Parcel 236 — 32 feet
Parcel 238 — 36 feet
Parcel 305 — 33 to 36 feet
Parcel 306 — 32 to 38 feet
Parcel 308 — 32 to 36 feet

Therefore, the heights to which buildings or structures can be erected on these parcels by present and future owners are limited to the above measurements.

According to the zoning map (Govt. Exh. No, 6) Parcels 234, 236 and 238 are located in Residential Zone "B" where the maximum building limitation is 2½ stories or 45 feet. However, all the witnesses agreed that the highest and best use of these parcels would be the typical dwelling in this area, i. e. a one or one and one-half story house which would not exceed in height the minimum limitations imposed by the easement.

Parcels 305, 306 and 308 are located in an industrial zone where the maximum height of structures by implication is 85 feet. But here again all the qualified experts agreed that the highest and best use of these industrial parcels would be a modern one or two story industrial building which would not exceed in height or protrude into the easement appropriated.

Parcel 305 is used in connection with the manufacture of cement blocks and has never been used for any other purpose. A small one-story building, approximately 40 by 50 feet, and 15 feet in height, is located on the parcel, but outside the perimeter of the easement.

Parcel 306 is a strip of land 22 feet wide and approximately 366 feet long which is occupied by 341 lineal feet of industrial railroad track owned by the Long Island Rail Road Company. Obviously this parcel is too narrow to permit the construction of any industrial building thereon.

Parcel 308 owned by the New York Telephone Company is used as a pole storage yard and is improved with a cyclone wire fence, some paving and a small one-story shed.

There has been no showing whatsoever that the taking of this avigation easement has in any way interfered with or impaired the utility of these existing structures, nor any other structures which it could reasonably be anticipated might be erected thereon, even if these parcels were to be put to what has been conceded to be their highest and best use. In fact the defendants' experts conceded that the limitation of height to future structures as a result of the imposition of this easement was inconsequential as a depreciating factor, since

any future residential or industrial structure would not extend into the glide angle plane.

■ The very substantial percentages of depreciation in market value (ranging up to 75%) which the defendants' experts attributed to the imposition of the easement was based on so-called "proximity damage", i. e. damage resulting from the location of these parcels under the glide angle plane and caused by the noise, psychological fear and danger incident to aircraft flying in close proximity to the defendants' properties and the effect of these factors upon those who might use the land or structures thereon.

■■ At the outset it must be noted that the burden of proof of establishing by a fair preponderance of the credible evidence the damage suffered and the compensation required to be paid for the estate taken rests on the owners. U. S. ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390; Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 692, certiorari denied 323 U.S. 726, 65 S.Ct. 59, 89 L. Ed. 583. Here, the proof showed that Mitchell Field has been in existence as an airfield since 1918 and that these parcels have been under the influence of the noise and danger of flying aircraft for many years prior to the taking of this easement. While it is true that by the imposition of the easement the Government has now taken the perpetual right to have all types of aircraft make unlimited numbers of flights in close proximity to defendants' properties, and that in so doing the Government has expressly appropriated a property right for which just compensation must be paid, nevertheless, the extent to which the utility of the property has been destroyed and its market value diminished must necessarily be established by factual data having a rational foundation in support of such a claim. Westchester Park Commission v. United States, supra, 143 F.2d at page 692. In my judgment these owners have failed to furnish the court with such factual material. Not only were the opinions of their experts based largely on speculation and conjecture, but these witnesses totally disregarded available evidence of comparable sales before and after the taking of the easement.

■ On the other hand, Mr. Niland, the Government's expert made a detailed survey of sales of residential and industrial parcels in the immediate vicinity of the defendants' properties, before and after the appropriation of the easement, which plainly indicated that there was no appreciable depreciation in the market value of similar parcels as a result of the imposition of the easement. For example, his survey showed that 505 similar residential lots of vacant land in this area, involving frontages without utilities or paved streets, were sold in June 1950 for $155 per lot. (Govt. Exhs. 11 and 12, Sale No. 2) The parcels involved in that sale were free from any avigation easement. In May 1952, 260 similar lots in the same vicinity were sold for $175 per lot, despite the fact that 77% of the total area involved was subject to an avigation easement of an approximate average of 40 feet which the Government had acquired in 1950. (Govt. Exhs. 11 and 12, Sale No. 1) Thus, there was an indicated increase of $20 per lot between the 1950 and 1952 sales despite the imposition of the 1950 easement in the meantime.

Mr. Niland also submitted evidence of two sales in 1953 of vacant land in this area, fronting on paved streets and subject to the instant avigation easement, where the prices were $320 and $500 per lot. (Govt. Exh. 13, Sales No. 101 and 102).

Based on these and other comparable sales it was Mr. Niland's opinion that the three subject residential parcels had a fair market value before the imposition of the easement of $200 per lot, particularly since they were unimproved and totally lacking in utility services and were located among many small parcels held in separate ownerships.

He estimated the damage resulting from the imposition of the avigation

easement over these residential parcels as follows:

| | "Before" Value | Ease-ment | Resultant Damage |
|---|---|---|---|
| Tract 234 (3 lots) | $600 | 32 ft. | $125 or 21% |
| Tract 236 (2 lots) | $400 | 32 ft. | $85 or 21% |
| Tract 238 (2 lots) | $400 | 36 ft. | $70 or 17% |

The difference in the percentages of damage was due to the difference in the height limitation of the easement over these parcels.

Mr. Niland's survey likewise showed that the imposition of this easement had a negligible effect on the sales of comparable industrial property in the area. For example, the New York Telephone Company contended that the value of its parcel (No. 308) was $1.20 per sq. ft. before the appropriation of the easement and only $.40 per sq. ft. thereafter. The sales relied upon by the Government indicate that the "before" value of $1.20 per sq. ft. is excessive. (Govt. Exhs. 12 and 15) With respect to the "after" value, it was shown by the Government that an industrial parcel located on the southwest corner of Oak and Brook Streets, directly opposite the Telephone Company parcel sold in December 1953, a year and a half after the imposition of this easement, for $.85 per sq. ft. (Govt. Exh. 13, Sale No. 104). Moreover, this parcel did not have as large an area as the Telephone Company parcel and did not have the advantage of a railroad siding.

Mr. Niland made a summary of industrial sales in the area which indicated that the value of industrial property in this vicinity had materially enhanced rather than depreciated in the past five years. (Govt. Exh. 15) Nevertheless, he estimated the damage to these industrial parcels as follows:

In connection with the industrial parcels, Mr. Niland estimated that 90% of the utility value of the property was below the 30-foot level and 10% above. Like the other witnesses, he considered that the buildings and structures were not depreciated as a result of the easement and limited his estimated damage entirely to the land values.

After inspecting the property and considering the evidence presented at the trial, it is my opinion that the amounts of damage attributed to these parcels by the Government's expert are fair and reasonable and amply supported by sales of similar properties in the vicinity both before and after the appropriation of the easement. His estimates were the only ones presented which had a factual foundation, and, in fact, were somewhat liberal, since the taking of the easement appears actually to have had little effect on comparable sales made since the taking. The proof submitted by defendants concerning the damage factors constituting so-called "proximity damage" seems to me to be too speculative upon which to predicate any award greater than that recommended by the Government.

While the court has also inspected the industrial development immediately adjacent to Teterboro Airport in New Jersey, and might well be justified in giving it considerable weight as a striking illustration of the negative effect of the elements of damage claimed by de-

| | Value per Sq. Ft. | "Before" Value | Damage |
|---|---|---|---|
| Tract 305 (Conti) | $.75 | $10,780 | $1,080 — 10% |
| Tract 306 (L.I.R.R.) | $.45 | $ 3,500 | $ 380 — 8% plus $1000 |
| Tract 308 (N.Y.Tel.Co.) | $.60 | $25,980 | $2,600 — 10% |

fendants, it has been eliminated from consideration in arriving at the above findings and conclusions.

Settle order.