UNITED STATES of America, Petitioner-Plaintiff,

v.

**48.10 ACRES OF LAND, MORE OR LESS, SITUATE IN THE TOWN OF NEW WINDSOR, COUNTY OF ORANGE, STATE OF NEW YORK,** and Mary B. Moroney, also known as Mary B. Maroney, et al., Defendants.

United States District Court
S. D. New York.
Aug. 15, 1956.

Arthur O. Maharay, Jr., Newburgh, N. Y., for defendants Robert S. Finley and Dorothy O. Finley.

J. R. Thompson, Newburgh, N. Y., for defendant Mary B. Moroney.

Burns F. Barford, Albany, N. Y., of counsel, for defendants.

Harry T. Dolan, Sp. Asst. to the Atty. Gen. of the United States, for petitioner-plaintiff.

KNOX, District Judge.

In these condemnation proceedings, instituted on May 23, 1955, the Government has acquired avigation easements over three parcels of land within the Town of New Windsor, Orange County, New York. Two of them are owned by Mary B. Maroney, and the other by Robert S. Finley and Dorothy O. Finley. The Declaration of Taking was filed on June 2, 1955.

In addition, the Government, for the purpose of the extension and improvement of Stewart Air Force Base, a large and active military installation, which is about three miles from the subject properties, has acquired the fee of several parcels of land adjoining, or close by, the properties affected by the easements. One of them is a 28 acre piece of land formerly belonging to the Finleys, and another is three fourths of an acre, owned by Maroney. The sums paid therefor were agreed upon by the parties, and are not before me.

The easement over the Finley parcel is identified as A109–E, and covers approximately 12 acres. It is a portion of a farm which, before the taking of the 28 acres in fee, contained 104 acres.

The two other parcels affected by the easements are designated as A108–E1 and A108–E2. They aggregate about 36 acres, and are a part of a 70 acre farm belonging to Maroney.

The rights and interests acquired by the United States are described in the Declaration of Taking as follows:

"3. The estate hereby taken for said public use consists of the following rights in and over the tracts of land described in Schedule 'A':

"(1) The continuing perpetual right to cut to ground level and re-

move trees, bushes, shrubs, or any other perennial growth or undergrowth infringing upon or extending into or above the Glide Angle Plane as described in Schedule 'Z'.

"(2) The continuing perpetual right to cut to ground level, remove, and prohibit the growth of such trees, bushes, shrubs, or any other perenial growth or undergrowth which could in the future infringe upon or extend into or above the Glide Angle Plane as described in Schedule 'Z'.

"(3) The right to prohibit the future construction of buildings or other structures from infringing upon or extending into or above the Glide Angle Plane as described in Schedule 'Z'.

"(4) The right of ingress to and egress from and passage on and over said tract to effect and maintain the necessary clearances.

"Reserving, however, to the landowners, their heirs, executors, administrators, successors, and assigns all right, title, interest and privileges as may be exercised and enjoyed without interference with or abridgment of, the easement and rights hereby taken for said public uses."

The average height limitations for constructions or growths upon the lands is approximately 85 feet. However, surrounding a high hill on the Finley lands, such limitations are much below the average. The height of the hill accounts for the low elevations of the easements. At points, there are no more than 15 to 20 feet.

On the road frontage along Drury Lane, the limitations range from 90 to 110 feet.

The glide angle plane, in this suit, extends westerly from the westerly end of one of the runways of the Stewart Air Force Base, and passes over the condemned lands.

The ultimate question before me is the compensation that should be paid to the owners of the aforesaid properties for the rights and interests specifically described and limited by the language used in the Declaration of Taking. Such compensation should represent the diminution in market value, if any, of these lands, which is due to the impairment of their utility.

The landowners contend that the Government, by taking these easements, has appropriated their air rights, and that they should have just compensation therefor. It is also contended that substantial damages should be awarded inasmuch as anticipated flights of aircraft over the lands will be at low levels. These, it is said, will cause fear, noise and vibration, and be productive of psychological effects upon persons residing on the premises. Such easements, it is argued, will seriously impair the utility of the lands for residential occupation. In support of these points of view, reliance is primarily based on United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206.

The rights taken by the Government may be described as obstruction easements. They are limited by the language used in the Declaration of Taking and, in and of themselves, do not include the right to fly aircraft over the lands of the condemnees.

As was held in United States v. 4.43 acres of land, etc., D.C., 137 F.Supp. 567, 569, the interest acquired "has but one function, insofar as these condemnation proceedings are concerned, and that is to serve as the ceiling over the land in question beyond which obstructions or structures may not be allowed to extend upward into the adjacent air space. Its nomenclature is unimportant." The Court further said that, by such easements, the Government did not acquire, and should not be required to pay compensation, for damages to the lands resulting from the flights of aircraft. The easements there acquired, as here, were limited to the prevention of obstructions or structures on the land extending into the air space above the "glide angle plane."

In the Causby case, supra, the factual and legal situation differed entirely from the one at bar. In that litigation, there had been no formal taking, or appropriation, of any right or estate in the land involved. The evidence established that the Government, by its frequent low level flights of aircraft, with attendant noise, vibration and bright lights at night, had destroyed the utility of the real estate for chicken raising, and had, in fact, destroyed many of the chickens. The Court ruled that, under such circumstances, there had been a taking of private property for public use, and that, consequently, appropriate compensation therefor should be made. Proof showing the loss in utility and value of the premises was abundant.

Here, more than a year has elapsed since these easements were taken, and, so far, at least, flights of aircraft over the lands have not impaired their utility.

■ The burden of proof in establishing the damages suffered, as a result of the imposition of the easements, rests upon the owners, and not upon the Government. Westchester County Park Commission v. United States, 2 Cir., 1944, 143 F.2d 688, certiorari denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583.

■ Any loss, or depreciation in value, incident to the low level flights of aircraft over the premises has to do with the future, and is not to be considered here. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. 4.43 acres, supra.

As is usual in cases of this character, the real estate appraisers are in sharp disagreement.

The only testimony taken at the trial was that of two real estate men, Hume F. Flynn, for the landowners, and Rendick Meola, for the Government. Each side conceded the competency of the witness of the other.

Flynn's testimony showed that the original 104 acre farm of the Finleys was about equally divided; 54 acres on one side, and 50 acres on the other, of Drury Lane, a macadam county road, which runs in a northerly and southerly direction. On the easterly side of the Lane, where the easements have been taken, the land rises sharply from the grade of the road, and in some places, as much as 20 to 30 percent. The farm dwelling, and its outbuildings, are to the south of the lands just mentioned, and are not covered by the easements.

Prior to the condemnation, Klinkowise Brothers, who had acquired lands to the east of those of Finley, and about an eighth of a mile away, commenced a real estate development for residential purposes. They built ten or twelve houses, and did so rather recently. Half of them were more of a summer type. The others were for year round occupancy. Their values ranged from $7,500 to $17,000, or thereabouts. Flynn made five sales in that vicinity. He also negotiated contracts for the building of homes on the property. However, he advised Klinkowise Brothers to cease operations when it was rumored that the Government was about to condemn land in that neighborhood.

The Klinkowise development is much different from anything that could be brought about on the lands under discussion. The owners had created a large lake to which purchasers of the plottage had access for bathing, and other recreational purposes. In this respect, the property was not, as Flynn admitted, comparable to the Finley and Maroney lands.

The Finley land, on which the easement has been imposed, has a frontage of 1,800 to 2,000 feet on Drury Lane, and a depth of 275 feet or more.

Drury Lane connects with State Route 207 on the south, and it has an entrance to Stewart Air Force Base. Route 17K is to the north. This route connects with the New York State Thruway, which is distant about three and one half miles.

Flynn testified that at or near each end of Drury Lane, which is approximately two and one half miles in length, there is a real estate development. Near

262

the southerly end, a man by the name of Gaston built several houses. He added that land development has been creeping up Route 207 from Newburgh, and from the Stewart Field entrance, and has also been creeping west on 17K. Close by the junction of 17K and Drury Lane, land was sold for development. This is about a mile and a quarter away, and houses have been built, starting from each end of Drury Lane, and are coming in toward the middle. They are one family ranch type houses, and they sell, on the average, from $14,000 to $15,000. Some of them have been built by owners who bought small pieces of land. He testified, "One of the big factors in selling residential properties in this area, is the personnel at Stewart Air Force Base. The majority of the personnel are officers, and many of them purchase homes because rents * * * are quite high."

Flynn also deposed that farms are disappearing in the neighborhood, and that developers are buying up land that has road frontage. He further testified that, near the northerly end of Drury Lane and on Route 17K, a man named Corey sold 40 acres of land for $40,000, and that in October of 1954, the Central School Board bought 13.59 acres of land on Route 207 for $10,000, or at $735 an acre. This was two and one half miles away from the Finley and Maroney properties. He likewise called attention to a sale about six miles away, of 125 acres of land for $32,000; this included the buildings thereon, which were valued at $9,500. One piece of land, about four miles distant, sold at $298 an acre. He cited two or three other sales in the general area.

In the opinion of the witness, the highest and best use to which the properties of Finley and Maroney can be put is for residential homesites. The land to the rear (the Klinkowise development) he said, "was going residential," and the sales made around it were for like purposes. He stated that school facilities are good, that the subject properties are in close proximity to Stewart Air Force

Base; that West Point is only a short distance away, and that Newburgh, a city of about 40,000 persons, lies within easy reach of the properties. He felt, therefore, that there is, potentially, a demand for homesites on the lands burdened by the easements.

On being asked whether the high hill on the Finley property would interfere with the residential development of the land, Flynn stated that, in his opinion, it would not; that the hill had an excellent view, with a nice woods upon it, and could be developed for expensive homes. In fact, he thought that the hill enhanced the value of the property for residential use. However, on further questioning, he conceded that, in order to render this portion of Finley's property readily available for a real estate development, it would be necessary to remove a substantial portion of the earth on the easterly side of Drury Lane, and deposit the same on the westerly side of the highway. This, he said, would involve the movement of 200,000 cubic yards of earth, at a cost of 35 cents a cubic yard.

In Flynn's opinion, the value of the 104 acres of the Finley property before the taking of the 28 acre fee, and the easements, based on residential use, was $30,500; that is, $24,000 for the land, and $6500 for the buildings. He valued the lands after the takings at $20,000, estimating the damage at $10,500. This depreciation figure was made up of an allowance of $5,000 for the 28 acre fee parcel, and $5,500 was allocated to anticipated sales resistance, and to psychological factors which, he attributed, in part, to future low level flights of jet airplanes over the property.

So far as the Maroney lands are concerned, the two parcels condemned, A108–EI and A108–E2, also abut on Drury Lane, and have a frontage thereon of 675 feet. On one of these parcels, the Maroney farmhouse, and its outbuildings, are located. On the southerly side of the property there is a private road, owned by Maroney, that runs from Drury Lane to the property of Klinko-

wise Brothers. They and Finley have a travel easement over it. A 1000 or 1500 feet to the north, on Drury Lane, there are two new houses. But, here again, the witness said that, by reason of the easement restrictions on height, and the possible low level flights of airplanes, land purchasers would refuse to buy any of the easement property for residential use.

Flynn placed a value on the 70 acre farm of Maroney before the taking, on the basis of residential use, at $22,900, $17,400 for the land and $5,500 for the buildings; and valued the same after the taking, at $13,200, fixing the depreciation at $9,700. He computed such depreciation by assuming a diminution in value as follows: $200 for the fee taken on three quarters of an acre, and $9,500 for consequential damages, including psychological considerations.

Mr. Meola, the Government's witness, testified that, in his opinion, the highest and best use of the lands in question is for agricultural and farming purposes. He described the Finley lands to the east of Drury Lane as high and hilly, and said that the lands to the west of Drury Lane are quite a bit below the grade of the Lane, but that they rise rather gently at a distance from the road. He added that most of the area was pasture land.

Meola said that he had familiarized himself with the vicinity, and the type of land in the general area. He had found no substantial real estate development on Drury Lane.

There was a small development in progress on Route 207, nearby the southerly end of Drury Lane. On a farm shortly to the north of the Maroney property, but not adjacent thereto, Meola had noticed a "For Sale" sign, and had learned that it had been there for about two years. One lot, approximating one and one half acres, had been sold for $1,000, and the purchaser had erected a ranch type house on the plot. No other plots have been sold. [It was established on the trial that the height for a ranch type home, or of a split level

house, ranged from 20 to 24 feet, and that the average height of a two and one half, or a three story dwelling, ranged from 30 to 35 feet, with an additional 10 feet, if a TV aerial were attached to the roof.]

Meola stated that, within the surrounding area, there are hundreds of acres of land on other farms of the general character of the Finley and Maroney properties, "equally suitable and adaptable for subdivision purposes, if the market and demand existed in this area."

In the vicinity of Newburgh, the witness found several land developments, and one or two others elsewhere. One is near the intersection of 17K and Drury Lane, about two miles from the Finley and Maroney lands. The commitment there was for the erection of 80 houses, and 25 of them have been sold. These subdivisions, in Meola's opinion, would be in competition with any effort to develop the Finley and Maroney properties; and that the latter are not ready for subdivision.

As to the parcels under discussion, he said: "Well, the terrain and topography of the land are such as to make it a very expensive operation in order to achieve any sort of level plots that would be desirable. The grade elevations are so high to the east, and, to the west, they are low." To develop this land, he averred, would mean that "you would have to build very costly roads. Retaining walls, undoubtedly, would have to be installed to keep back the earth * * * (and) drainage problems would * * * present themselves, because of the terrain * * *" and "that it would be economically infeasible for anyone to purchase the properties, and project a residential development upon them;" that they were "at best suitable and adaptable only for agricultural purposes."

Meola thought that there was no substantial damage to either the Finley or Maroney properties by reason of the easements, and that the Finleys' recovery should be limited to $150 on Parcel

A109–E, and that of Maroney, on Parcels A108–E1 and A108–E2, to $250.

It was contended by counsel for the landowners, and admitted by Meola, that, in at least one instance, in an easterly direction, where the plane height limitations are very low, the easement, in a small area, if one wanted to build thereon, was practically equivalent to the taking of the fee.

There was some argument upon the trial pertaining to the formula to be applied in awarding just compensation. The defendants' theory was that the Court should take into consideration the damages suffered by the remaining lands of Finley and Maroney, namely, those upon which no easements have been taken. In this case, I shall not sustain this contention. See, United States v. Miller, 1942, 317 U.S. 369, 63 S.Ct. 276, 87 L. Ed. 336.

■■ There is no evidence to indicate that the utility of the remaining lands of Finley and Maroney, if used solely for farming and agricultural purposes, has been, or will be, impaired as a result of the easements taken on the aforesaid parcels. Furthermore, the proof fails to show that there was, at the time of taking, an immediate demand and market for the residential development of the lands.

■ However, it does appear that some of the condemned property probably is adaptable for residential purposes, particularly the Drury Lane frontage of the Maroney lands. But, in the absence of proof of a reasonably imminent demand and market, as of the date of taking, such element of adaptability cannot be considered in assessing the damages sustained by the condemnees. Olson v. United States, supra.

Agricultural and farming purposes are the only uses to which the Finley and Maroney lands have heretofore been put. This was true as of the time of taking, and such uses are the only bases upon which market value can fairly be determined. United States v. Miller, supra;

United States v. 63.04 acres, D.C.E.D. N.Y., 142 F.Supp. 239.

In passing, it may be observed, that a farmer, owning 57 acres of good tillable farm land, entirely clear, generally rolling to level terrain, located immediately south of the Finley tract on Drury Lane, sold his land in 1952, including a valueless old barn, for $22,500, which indicated a value of $390 per acre. This farm has a frontage on Drury Lane of approximately 1,500 feet. So far, however, it has not been subdivided into building plots.

The easements acquired on the Finley and Maroney parcels fall far short of being the equivalent of a fee. Nevertheless, the easements are perpetual, and the owners, together with their successors in title, for all time to come, must bear the servitude which the Government has imposed upon them. They prohibit the owners of the properties from building as and where they choose. Trees and other growths must not be permitted to rise beyond limited heights. Several hundred trees that were growing on the properties have been, or will be, mutilated or destroyed. The easements themselves are a detriment, and, no matter what the future may bring, these lands, possibly, can never be fully developed into homesites.

Along the interior line of the Finley easement, the restriction on height, from the southerly to the northerly boundaries, are as follows: 38, 20, 25, 36, 35 and 22 feet. The corresponding elevations on Drury Lane, about 275 feet to the west, are 110, 100, 95, 100, 90 and 95 feet. Along the private road of the Maroney land, the height limitations are 28, 40, 55, 85, 100 and 100 feet. Interior elevations on parcel A108–E1 are 15, 20, 25, 55 and 60 feet. On the northerly boundary of parcel A108–E2, they are 20, 50, 80, 95 and 110 feet. Still, other interior elevations run from 55 to 90 feet.

■ In my opinion, the ready and competitive marketability of the tracts, as they now stand, has been adversely

affected. Few, if any, prospective purchasers, for farm use, or otherwise, will offer a fair price for the properties. They will not, I should think, wish to bear the burden of the easements.

The condemnees, if they wish to divest themselves of their ownerships, will be obliged to take what they can get. In other words, the easements have rendered the lands much less desirable, even for farm use, than they otherwise would be. Meola said "emphatically" that there is a market for building sites all over Orange County. It thus appears that the area is undergoing a general development, and the properties of the defendants cannot fully participate therein.

For the reasons set forth above, and to the extent noted, the Government has appropriated the lands in question, and, for such taking, it should pay fair compensation to the owners.

As heretofore shown, the Finley tract will require expensive treatment for residential uses. One of the Maroney tracts contains a sizeable pond or swamp. And this, for full development purposes, will need to be filled—an expensive undertaking.

But, conceding all the limitations of the properties, and granting that there is no present market for the lands as building sites, I cannot believe that the loss suffered by the condemnees should be limited to $150 for the Finley tract, and $250 for the two belonging to Maroney.

Meola appraises the lands of Finley and Maroney, excluding the buildings, based on farm use, at $200 per acre. For present purposes, I shall accept this appraisal of the lands as their fair market value. However, the sums he suggests as payments to the Finleys and Maroney, for perpetual limitations on their lands, are little more than tokens; hardly more indeed, than neighbors of

the condemnees might pay them for cow pasturage over a short term of years. As matters stand, the landowners have acreage, which, due to the burdens that have been imposed upon it, has lost a substantial portion of its value.

The loss in value to the Finley land, according to the Government's witness, is about $12.50 per acre. His estimate for the depreciation of the Maroney parcels is something like $7 per acre. These devaluations, I believe are completely unrealistic. In my judgment, the devaluation of each of the parcels, at a minimum, should be fixed at $50 per acre, and such is my conclusion.

Nothing will be awarded to the condemnees for damages to their lands which are not covered by the easements.

Judgment is therefore directed to the effect that:

(a) The fair value and just compensation which should be paid by the Government to the Finleys for the taking of easements on Tract A109–E, consisting of approximately 12 acres, is hereby fixed and determined as follows:

Value of 12 acres at $200 per acre
before taking     $2400
Depreciation attributable to
easements     600

Value of 12 acres after taking     $1800
Just compensation     $600

(b) The fair and just compensation which should be paid by the Government to Maroney for taking of easements on Tracts A108–E1 and A108–E2, consisting of approximately 36 acres, is hereby fixed and determined as follows:

Value of 36 acres at $200 per acre
before taking     $7200
Depreciation attributable to easements     1800

Value of 36 acres after taking     $5400
Just compensation     $1800