**ÆTNA LIFE INSURANCE COMPANY OF HARTFORD, CONNECTICUT, Appellant,**

v.

**Dorothea STOKES, Appellee.**

**No. 16754.**

United States Court of Appeals Fifth Circuit.

March 5, 1958.

Rehearing Denied April 3, 1958.

T. J. Blackwell, S. J. Powers, Jr., Blackwell, Walker & Gray, Miami, Fla., for appellant.

Henry G. Simmonite, Walsh, Simmonite, Budd & Walsh, Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

Brought by his wife, as beneficiary, to recover for the alleged accidental death of her husband, an employee of United Cigar and Whelan Stores Corporation, the face amount of the policy, the suit was on a group accidental death and dismemberment policy covering any insured employee for death or dismemberment occurring "as the result of a bodily injury effected during the term of the policy solely through external violent and accidental means, independently of all other causes."[1]

Her claim was: that, while plaintiff's decedent was hospitalized, he had come to an accidental death, within the terms

1. The policy also contained a limitation on, or exclusion from the coverage which as pertinent here is as follows:

"Insurance under this policy shall not cover any loss caused directly or indirectly, wholly or partially, or contributed to substantially by bodily or mental infirmity; or ptomaines; or bacterial infection * * * or any other type of disease; or medical or surgical treatment. * * *"

and conditions of the policy, as a result of a fall from the window of his hospital room, due to an unknown cause, necessitating resort to circumstantial evidence. Stated in more detail, it was that "it could be assumed that Mr. Stokes, while attempting to open the venetian blinds of the window to obtain air, in an unknown manner accidentally fell out of the window and sustained external and violent bodily injuries which alone were the cause of his death and that his death was not caused directly or indirectly, wholly or partly, or contributed to substantially by bodily or mental infirmity or any other kind of disease."

The defendant, in its answer, denied generally the allegations of the complaint and specifically denied that the death was effected directly and independently of all other causes, through external, violent and accidental means. It averred on the other hand that the death occurred "directly or indirectly as a result of the decedent's pre-existing physical illness and disease or the medical treatment therefor, or a combination of both."

After the pleadings were settled and issue joined, defendant filed its motion for summary judgment with a copy of the policy, No. LL2779, together with an affidavit of an officer of the defendant corporation, and relied upon all the pleadings, together with the deposition of the decedent's treating physician, Dr. E. J. Thomas. The court denied this motion.

Thereafter the case was tried on uncontradicted evidence [2] to the court and a

2. This was that on or about May 8, 1954, plaintiff's decedent, William B. Stokes, while on a fishing trip, developed acute pain in his upper abdomen, and called upon Dr. E. J. Thomas, a close personal friend of his, for care and treatment. A provisional diagnosis of acute gall bladder colic, possibly cholecystitis with a stone in the common bile duct, was made and Stokes was immediately hospitalized at St. Francis Hospital, Miami Beach, Florida. While at the hospital, Stokes was given repeated large doses of atropine, morphine and demerol, together with heavy doses of tetrasine, penicillin and streptomycin, as antibiotics. He was, at times, irrational and his widow testified that she observed him on her visits going through the motions of filling imaginary prescriptions (he was a druggist), that he told her he saw horses on the oxygen tanks in the room, but that he referred to the medications which he himself was taking, and in the wife's own words: "He knew that was causing that". Other visiting friends also testified that he was at times irrational.

On the evening of May 11, 1954, at 10 o'clock P.M., Stokes was disoriented and confused. At 10:30 P.M., the same evening, he was given additional doses of morphine and atropine, and at 11:20 P.M., sideboards were applied to his bed (St. Francis Hospital record). At 12 midnight, he was awakened and given a shot of penicillin. After this Stokes was trying to get out of bed and was later seen walking in the hall and starting down the steps, stating that his wife was sick and that he wanted to go home.

A night watchman was called to assist a nurse in getting Stokes back to his room. He refused to go to bed but sat in a chair in his room. At approximately 4 A.M. the next morning, May 12, 1954, and soon after he had been returned to his room by the night watchman, the nurse received a telephone called from Dr. E. J. Thomas, Stokes' treating physician, whom she had been trying to reach all evening. While she was talking to the doctor across the hall from Stokes' room, she heard a crash coming from his room. She, together with another nurse, rushed over to Stokes' room just in time to see both of his feet going out of the window. The screen was hooked, the window open, and the venetian blinds had been down. As the nurses entered the room, they saw a hole in the screen and the venetian blinds drop. Dr. Thomas rushed to the hospital and found Stokes lying on the ground underneath the third floor window from which he had jumped.

Upon returning Stokes to the hospital, the doctor found him to be fully conscious and talked with him about the cause of his jumping. Stokes told the doctor that he was riding on a train and that there were two crooks or two men who were trying to rob him, and that he had money from a store and that they were trying to get it, and that the only way he could get away from them was to jump out of the train window. Later on he said that he remembered he had gone out the window of the hospital and remembered striking his head on the side of the building as he was somersaulting going down. He also said he wouldn't

jury, and defendant's motion for a directed verdict denied, there was a verdict for plaintiff, followed by a denial of defendant's motion for judgment non obstante and a judgment for plaintiff, and this appeal followed.

Here presenting four specifications of error,[3] defendant-appellant urges upon us that the district judge erred in denying its motions for summary judgment, for a directed verdict, and for judgment non obstante, and that the judgment must be reversed and here rendered in its favor.

For the reasons hereafter briefly stated, we agree with the defendant. There was no conflict of fact to resolve, the evidence was all one way. Suicide, the issue to which part of plaintiff's testimony was directed, was not in the case, and the court so stated in his charge. The single issue for determination here is whether, as defendant contends, the death of the decedent was not accidental, within the meaning of the policy, but was contributed to substantially in whole or part by his existing illness or disease or by the medical treatment administered in an endeavor to cure such illness or disease, and this was established as matter of law, or whether, as contended by plaintiff, there was sufficient evidence to take the case to the jury and support its verdict that the death was the result of an accident to which neither his illness nor the medical treatment contributed substantially.

Plaintiff, recognizing that the case was devoid of testimony to support her theory, states in her brief:

"Plaintiff's theory of the case is that the fall, while due to an unknown cause, necessitating circumstantial evidence, was, nevertheless, the sole cause of death within the terms and conditions of the policy."

Basing her whole case upon this theory and her assumption in support of it, quoted herein above, she endeavors to overcome the direct and positive testi-

have jumped if he had known it had been so high. After being returned to the hospital, he told the nurse that he thought they were taking him to prison and he said that his only chance was when the nurse left the room and that's why he jumped.

He apparently landed on both feet when he hit the ground after his jump from the third floor window and sustained fractures of both femurs and a fracture dislocation of the right ankle and compound fractures of the tibia and fibula on the right side. He was placed in traction and for approximately two days his condition was fair, but he suddenly developed gangrene of the right foot and lower leg due to a thrombus in the right popliteal artery, a high fever followed, he went into a state of collapse and died on May 18, 1954.

His personal friend and treating physician throughout the entire illness, Dr. E. J. Thomas, testified on deposition taken by Stokes; attorney before the motion for summary judgment was presented, and reiterated the same testimony at the trial, that at the time Stokes jumped from the third floor window of the hospital, he was suffering from a toxic psychosis produced by the toxemia of his acute pancreatitis or, from the heavy dosages of medication, including atropine, morphine, demerol and antibiotics, or from a combination of both. He stated that it was all an unfortunate chain of events that led to his death; that the chain of causation of Stokes' death started with the pancreatitis or medication or a combination of both, which produced the toxic psychosis in the course of which he jumped from the hospital window.

**3.** "(1) The court erred in denying defendant's motion for summary judgment with affidavit attached.

(2) The court erred in denying defendant's motion for directed verdict made at the close of all the evidence in in the case.

(3) The court erred in denying defendant's motion to set aside verdict for the plaintiff, and any judgment thereon, and to enter judgment for the defendant or, in the alternative, to grant defendant a new trial.

(4) The court erred in failing to apply the substantial evidence rule in this case, by its refusal to direct a verdict at the close of all the evidence in the case and again on renewal by way of motions after verdict, where the record conclusively showed that the plaintiff had wholly and completely failed to make out a prima facie case for submission to the jury, on the basis of the legally credible substantial evidence herein."

mony in the case by, what she truly calls an assumption, mere speculation and surmise, tailored, in the absence of any evidence pointing that way, to fit the pressing needs of her case.

 In McNamara v. American Motors Corp., 5 Cir., 247 F.2d 445, 449, where the plaintiff put forward a theory and assumption of this kind, that circumstantial evidence may be moulded to fit the needs of the case, this court, stating:

"Appellant recognizes, indeed concedes, the necessity to her case of making proofs of the facts her theory requires, and recognizing the extreme difficulties of her situation, arising from the absence of any affirmative proof thereof, she seeks, with a perseverance and skill worthy of a stronger cause, to supply, by theorizing, the fatal absence of the needed proof."

pointed out that under Florida decisions, indeed generally, such assumption and theorizing cannot take the place of proof and that a verdict may not be based on speculation and conjecture. We repeat here what we said there:

"We think the plaintiff's claim is untenable in law and in fact. It is untenable in law because it unwarrantedly assumes, contrary to settled law, that theory and speculation, as to how decedent's death occurred, can serve as evidence, satisfying plaintiff's burden to make out her case, and shifting to defendant the burden of showing by evidence that plaintiff's theory was wrong, or of coming forward with a theory of its own, as to decedent's death, and evidence showing it to be a better, that is a more plausible, theory than the one plaintiff advances.

"It is untenable in fact because, as appellant herself admits, it is not sufficient for her to show that it was possible for the accident to have happened in the way she theorized it did, she must show that it was more probable that it happened that way, and yet she offers no evidence whatever showing or tending to show that the facts required by her theory actually existed."

 We add to it that here not only has plaintiff failed to make the proof necessary to entitle her to go to the jury, but the defendant has come forward with positive and overwhelming proof that her theory is completely untenable and that the death was not covered by, but was excluded from, the policy.

The judgment is therefore reversed and the cause is remanded with directions to enter judgment for defendant.