### UNITED STATES of America, Appellant,

v.

### Lilly Lind BRONDUM and Barthel P. Brondum, Owners of Tract No. J–923–E, Appellees.

### No. 17786.

United States Court of Appeals Fifth Circuit.

Dec. 8, 1959.

Elizabeth Dudley, Roger P. Marquis, Dept. of Justice, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., Keener T. Blackmarr, Asst. U. S. Atty., Mobile, Ala., Ralph Kennamer, U. S. Atty., Mobile, Ala., for appellant.

Chris C. Delaney, Mobile, Ala., D. R. Coley, Jr., Mobile, Ala., for appellees.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This appeal turns on the distinction between *a clearance or obstruction easement* and an *avigation or flight easement*. These terms are not jargon leading to fruitless semantics; not in condemnation proceedings, anyway. In condemnation proceedings they are useful tags to identify distinctive estates in property. Here, the district judge erred in interpreting a clearance easement as an avigation easement.[1] The district judge's direction of the trial and his

---

1. This is shown by the following colloquy: "Judge Thomas. Mr. Blackmarr chooses to call it a clearance easement. You choose to call it an avigation easement. I know they are taking it for the use of the planes at Brookley Field.

"Mr. Blackmarr. It is merely a safety factor in case a plane gets off course. If

charges to the jury were based on the error, and as a consequence the easement granted was not the easement described in the declaration of taking. The case must be remanded for a new trial.

On September 6, 1957, the United States instituted condemnation proceedings to acquire an easement affecting 1.44 acres of land belonging to Mr. and Mrs. Barthel Brondum near the Brookley Air Force Base in Alabama.[2] The declaration of taking describes the estate as follows:

"The estate taken for said public uses is the continuing perpetual right to clear, and keep clear, only those portions of all trees, bushes, shrubs, or other perennial growth or undergrowth infringing upon or extending into or about [sic] a plane 10 feet below and parallel to the Glide Angle Plane and/or Transitional Plane described in Schedule 'X' attached hereto and made a part hereof; the continuing perpetual right to remove, to raze, to destroy, and to prohibit the future construction of buildings or portions thereof, other structures or portions thereof, land embankments of earth and other materials infringing upon, extending into, or extending above the aforesaid Glide Angle Plane and/or Transitional Plane; and the right of ingress to, egress from, and passage on the said lands for the purpose of exercising the rights hereby taken, subject to existing easements for public roads and highways, public utilities, railroads and pipe lines; reserving, however, to the owners, their heirs, executors, successors, and assigns all right, title, interest, and privilege as may be exercised and enjoyed without interference with or abridgement of the rights hereby taken."

There is no ambiguity in this description of the easement. The only words that require any explanation are "Glide Angle Plane and/or Transitional Plane".[3] There is no mention of the right to fly over the land. In plain words, the Government seeks to acquire the right to cut trees and natural growth to a prescribed height and to remove man-made obstructions above a prescribed height. The estate therefore is sometimes referred to as a "flight obstruction easement".[4] Graphically and accurately, Judge Estes describes the easement as a "ceiling".[5] The purpose

---

one gets off course and invades Mr. Brondum's property, he has a right of action against the Government.

"Judge Thomas. I don't see that it makes any difference what they call it. It is the right condemned. It is the right to free use of the area above this imaginary line.

"Mr. Blackmarr. No, sir, all we are taking is the right to clear trees, and not the right to fly over.

"Judge Thomas. I don't agree with you. If they were not going to fly over it, there would be no need to cut the trees off it. It suits me to call it an avigation easement."

2. The jurisdiction of the district court was invoked under various Acts of Congress authorizing this proceeding, including the Act of August 1, 1888, 25 Stat. 357, 40 U.S.C.A. § 257; Sections 2663 and 9773 of Title 10 United States Code, which authorize the acquisition of land for military purposes; the Act of August 7, 1953, 67 Stat. 428, which authorizes ac-

quisition of the land; and the Act of August 7, 1953, 67 Stat. 448, which made funds available for such purposes.

3. The glide angle plane does not represent the actual line of flight but is the minimum elevation of the approach zones including the allowance of a safety factor. It varies with the contour of the land and depends upon the elevation of the ground beneath any given point in the glide angle plane and the height of the plane above the earth's surface at the given point. Generally in military operations this minimum glide angle commences at ground zero at least 1000 feet from the runway and rises one foot vertically to every 50 feet horizontally.

4. United States v. 48.10 Acres of Land, etc., D.C.S.D.N.Y.1956, 144 F.Supp. 258.

5. The interest acquired "has but one function, insofar as these condemnation proceedings are concerned, and that is to serve as the ceiling over the land in question beyond which obstructions or struc-

of the ceiling is to increase the margin of safety for flying by assuring that the glide zone will be free from natural growth or man-made obstructions and the pilot's vision unobscured above a designated altitude.

An avigation easement may or may not contain provisions dealing with obstructions, but, unlike a clearance easement, in express terms it permits free flights over the land in question. It provides not just for flights in the air as a public highway—in that sense no easement would be necessary; it provides for flights that may be so low and so frequent as to amount to a taking of the property. Thus, when an avigation easement is taken, such language is used as: "for free and unobstructed passage of aircraft through the airspace above the portions of clear zones", (United States v. 51.8 Acres of Land, etc., D.C.E.D.N.Y. 1957, 151 F.Supp. 631, 633); a "perpetual and assignable right of way and easement in and over * * * for the flight of aircraft * * *" (United States v. 26.07 Acres of Land, etc., D.C. E.D.N.Y.1954, 126 F.Supp. 374, 375).

The physical location of the Brondums' property is such that the Government would have no need for an avigation easement. The property is located 735 feet opposite the midway point of the runway. There is no reason for planes to fly over the Brondums' land, unless an emergency should make such a flight unavoidable. Further, planes may never fly at such low altitudes as to interfere with the use of the property.

There is no large body of authority on the issue before us. What there is supports the position of the United States. In United States v. 64.88 Acres of Land, 3 Cir., 1957, 244 F.2d 534, 535, a similar easement was interpreted as only a clearance easement. The Court stated:

"We think this description is clear and unambiguous. It specifies without any doubt or uncertainty what may be removed by the government

and to what elevation above ground level the landowner remains free to build at any given place on his tract * * * it is pointed out that the elevations defining the altitude above which no obstructions are to be permitted are substantially lower than any flight path which could lawfully be used or approved for approaching the present Greater Pittsburgh Airport under the regulations of the Civil Aeronautics Authority. On this record it must be accepted that the claimed right of clearance is merely a provision for assuring that space shall be unoccupied and vision unobstructed above a designated altitude. Unquestionably, this is an aid of avigation. But no flight easement is mentioned or to be inferred, much less claimed, in the present pleadings and, therefore, no servitude can be imposed except for the asserted and precisely limited rights of clearance. * * * If any subsequent low flying of aircraft over appellee's land should occur and should be said to invade property rights, the acquisition of the right to keep that space clear will not have conferred any attendant right to fly through it."

In that case the court cited with approval and quoted from United States v. 4.43 Acres of Land, D.C.N.D.Tex.1956, 137 F.Supp. 567, 572 that also involved a similar easement. Judge Estes pointed out, in language applicable here, that there could be no compensation for any damages occasioned or likely to be occasioned by the flight of aircraft, because the Government had not taken the right to use the airspace for that purpose:

"This is because the Government in each of these proceedings has acquired title to the exact easement or estate which is described in the Declaration of Taking and nothing more. 40 U.S.C.A. § 258a, 48 Stat. 1421; United States v. 29.40 Acres

tures may not be allowed to extend upward into the adjacent air space. * * *"

United States v. 4.43 Acres of Land, D.C. N.D.Tex.1956, 137 F.Supp. 567, 569.

of Land, D.C.N.J.1955, 131 F.Supp. 84. Furthermore, the Court is powerless to change the Declaration of Taking so as to enlarge the easement or rights which the Government has condemned in these proceedings. United States v. 16,572 Acres of Land, D.C.S.D.Tex.1942, 45 F.Supp. 23."

In United States v. 48.10 Acres of Land, etc., D.C.S.D.N.Y.1956, 144 F. Supp. 258, 260 the easement was described in the same language used here. In denying compensation for damages for anticipated flights of aircraft over the land the court said: "The rights taken by the Government may be described as obstruction easements. They are limited by the language used in the Declaration of Taking and, in and of themselves, do not include the right to fly aircraft over the lands of the condemnees." See also United States v. 29.40 Acres of Land, D.C.N.J.1955, 131 F.Supp. 84; United States v. 26.07 Acres of Land, D.C.E.D.N.Y.1954, 126 F.Supp. 374.

The United States Government has complete discretion in determining whether to take a clearance easement or to take an avigation easement,[6] and upon the filing of the declaration of taking and the depositing of the estimated compensation for the taking, here $2,000, the title described in the declaration passed to the Government. The district court lacked jurisdiction to compel the United States to take an avigation easement.[7] Correlatively, the jury's verdict of $6,000 should have been set aside since it was based on valuations grounded on assumed facts that were not present in the case.[8]

United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206, giving the coup de grace to the notion that ownership of land extends to the heavens, makes it plain that no taking occurs by the flight of aircraft in itself. "Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." In the future, if the Brookley Air Base runways should be changed and if there should be low and frequent flights, the Government may institute condemnation proceedings to acquire an avigation easement. Or, if a taking should occur in fact without a proceeding having been instituted, the Brondums, like Causby, have a remedy under the Tucker Act, 28 U.S.C.A. § 1346(a) (2), or in the Court of Claims 28 U.S. C.A. § 1491.[9] But in a condemnation proceeding courts cannot compel the

---

6. As this court said in United States v. 6.74 Acres of Land, 5 Cir., 1945, 148 F. 2d 618, 619–620: "Upon the filing of the declaration of taking and the depositing of the money in the registry of the court, fee simple title to the lands immediately passed to the Government. The necessity for the taking was by the Congressional Acts placed solely within the discretion of the Secretary of War and is not a question with respect to which courts are vested with jurisdiction. The court below, therefore, was without right to question the action of the Secretary of War either as to the necessity of the taking or as to the extent of the right or interest in the property taken."

7. The judgment vested in the United States "a perpetual clearance easement and a perpetual avigation easement or the right to fly aircraft over the glide angle plane described in said clearance easement over

said lands, as described in Schedule "A" and Schedule "X" attached to the declaration of taking."

8. "A jury's verdict must have some reasonable basis in the evidence and may not be sustained if it rests wholly upon surmise and speculation." Montgomery-Ward & Co. v. Sewell, 5 Cir., 1953, 205 F.2d 463, 468; McNamara v. American Motors Corporation, 5 Cir., 1957, 247 F. 2d 445, 450; Aetna Life Insurance Co. of Hartford, Conn. v. Stokes, 5 Cir., 1958, 252 F.2d 383, 386.

9. United States v. 64.88 Acres of Land, 3 Cir., 1957, 244 F.2d 534, 536; United States v. 4.43 Acres of Land, etc., D.C. N.D.Tex.1956, 137 F.Supp. 567, 572; Herring v. United States, Ct.Cl.1958, 162 F.Supp. 769; Ackerman v. Port of Seattle, Wash.1958, 329 P.2d 210.

United States to take and pay for an estate not described in the declaration of taking.

The judgment is reversed and the case remanded for a new trial.