**CITY OF AUSTIN/Travis County Landfill Company, L.L.C., Appellants,**

v.

**TRAVIS COUNTY LANDFILL COMPANY, L.L.C./City of Austin, Appellees.**

No. 03–98–00455–CV.

Court of Appeals of Texas, Austin.

Aug. 26, 1999.

Rehearing Overruled Sept. 14, 2000.

---

Andrew F. Martin, City Attorney, David Allan Smith, Assistant City Attorney, Austin, for Appellant.

John McClish, Womack, McClish, Wall & Sick, P.C., Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices KIDD and PATTERSON.

MARILYN ABOUSSIE, Chief Justice.

This case involves the City of Austin's operation of the Austin–Bergstrom International Airport ("the airport"). A jury found the City of Austin ("City") liable to the Travis County Landfill Company, L.L.C. ("TCLC") for taking, by overflights, the airspace over TCLC's property, which is located approximately one-half mile south of one of the airport's two runways. The jury also found that, as a result, TCLC suffered $2,950,000 in damages. The City appeals the trial court judgment rendered in favor of TCLC; TCLC appeals the trial court's denial of its request for a permanent injunction and attorney's fees. We will affirm the trial court's judgment.

## BACKGROUND

The City owns and operates the airport, which is located in southeast Travis County on a site formerly occupied by Bergstrom Air Force Base ("Bergstrom").[1] The airport came to be located on this site after the City's voters approved a May 1993 referendum to build a new municipal airport there. The City officially took ownership of the Bergstrom property during a September 1993 ceremony.

TCLC owns a 135–acre tract of land located approximately one-half mile south of airport runway 35L. This land is burdened by a "Perpetual Overflight Easement for Military Aircraft" (the "Easement") granted by TCLC's predecessors in title to the United States and its assigns. The Easement gives the grantee the right to prohibit or remove any obstacles from intruding into a certain amount of airspace above the subject property. The Easement also conveys "the right of unob-

1. The federal government decided to close Bergstrom in the early 1990s. Pursuant to a 1942 agreement between the City and the federal government, the Bergstrom property reverted to City ownership.

structed passage of all *military aircraft* and *aircraft operated under military control* . . . in all air space above the surface of the Grantors' property. . . ."[2] (Emphasis added.) The City informed the federal government that it planned to operate the Bergstrom property as a municipal airport subject to federal regulation, and thus needed a number of easements acquired by the Air Force during its operation of Bergstrom. The federal government therefore assigned the Easement burdening TCLC's land to the City. According to Mike Mays, TCLC's manager,[3] the City asked TCLC to expand the Easement to permit overflights for all aircraft, rather than just military aircraft. Mays testified that TCLC refused the request because overflight rights are "a valuable asset" and TCLC did not feel that it "should have to donate [the rights] to the City." The City did not obtain or purchase an easement for civilian flights over TCLC's land.

The airport began commercial air cargo operations around June 30, 1997. TCLC sued the City, alleging that the City's operating and flying civilian operations through airspace over TCLC's land without permission constituted a taking of its property. *See* Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged or destroyed for . . . public use without adequate compensation being made."). TCLC requested the court to declare that the scope of the Easement did not include avigation rights for municipal airport purposes, and sought an injunction prohibiting the City from authorizing or directing overflights of the subject property until the City obtained legal overflight

rights through condemnation proceedings or through purchase of an easement.[4] TCLC also sought actual and exemplary damages for trespass and inverse condemnation, as well as attorney's fees.

By the time the parties presented their case to the jury, the airport had flown over six thousand non-military flights through the airspace above TCLC's property. The City's position throughout trial was that TCLC had no right to the airspace above its land; therefore, civilian overflights did not take or cause any harm to TCLC's property. The City argued below and argues now on appeal that TCLC's property instead was harmed by height restrictions already imposed on the property by federal aviation law, the Easement, and the City's Hazard Zoning Ordinance. The City reasons that because these height restrictions burdened TCLC's land before the airport began flying air cargo operations over the land, the City took nothing from TCLC when civilian operations commenced.

The City's theory that TCLC's property is limited by height restrictions, rather than overflights, is based on the use to which TCLC intends to put the subject property. The trial evidence established that TCLC owns a permit to operate a Type IV landfill on its property. This permit allows dry waste to be deposited in the landfill, such as construction and remodeling rubble, tree clippings, and tires.

We begin with a short history of the development of the landfill project. An enterprise named 244 Joint Venture purchased the subject property in 1983. Because the subject property is adjacent to

2. The right to fly over the subject property is known as an "avigation" easement. The term "avigation" "applies to the navigation of airspace." 2A CJS *Aeronautics & Aerospace* § 2 (1972). "Thus, an avigation easement generally is an easement of right to the navigation of airspace over designated land and to the use of land as an incident to air avigation. . . . It provides not just for flights in the air as a public highway, but for flights that may be so low and so frequent as to amount to a taking of the property." *Id.*

3. Mays compared his position to "a corporate officer, if [TCLC] were a corporation."

4. The trial court granted TCLC's request for a temporary injunction. The City appealed, and this Court dissolved the temporary injunction in an unpublished opinion. *See City of Austin v. Travis County Landfill Co.*, No. 03–97–00515–CV, 1998 WL 78641 (Tex. App.—Austin February 26, 1998, no pet.) (not designated for publication).

the City's Type I landfill,[5] the members of 244 Joint Venture believed it could also be developed as a landfill. Therefore, they formed a partnership called the Travis County Landfill Company (the "Company") to obtain a permit to operate a Type IV landfill[6] on the property. The Company obtained the permit in 1988. Because of a lull in building projects in the late 1980s, the Company determined that there was an insufficient stream of construction waste to justify the expense of opening a Type IV landfill at that time.

In 1992, the Company changed its business structure to become TCLC, the limited liability company that is a party to this case. The Federal Deposit Insurance Corporation closed the bank holding 244 Joint Venture's note and requested full payment of the note. TCLC paid the outstanding amount of the bank loan in December 1993, thus bringing under its ownership both an interest in the subject property and the landfill permit.

The appraisal experts for the City and TCLC both testified that, excluding the existence of the airport, the highest and best use of TCLC's land was a Type IV landfill vertically expanded beyond the existing permit. TCLC also presented the testimony of a professional engineer who stated that but for the airport it was "extremely likely" that the Texas Natural Resource Conservation Commission ("TNRCC") would grant a vertical expansion of the existing permit.

Both parties' appraisal experts explained that valuing the subject property as if the airport did not exist is the first step in determining the damages resulting from an alleged taking by a federally funded project, such as the airport. After determining the fair market value of the whole property, excluding from consideration the construction and operations of the airport, the appraisers determined the fair market value of the property immediately after the taking, considering the uses to which the remainder will be subjected. Both parties' appraisal experts agreed that, excluding the existence of the airport, the highest and best use of TCLC's land was a vertically expanded Type IV landfill. Furthermore, both parties' experts testified that, excluding from consideration the construction and operations of the airport, the fair market value of TCLC's property was $9,800,000. Both experts also expressed the opinion that the fair market value of the property decreased with the airport in operation. Two reasons identified by the experts for the decrease in value were: (1) TCLC's inability to vertically expand its landfill beyond the existing permit; and (2) the increased risk associated with operating a landfill adjacent to a municipal airport. The experts differed as to the effect of the increased risk. The City's expert testified that the remainder of TCLC's land, considering the airport operations, was worth $7,500,000, while TCLC's expert determined the remainder to be worth $6,200,000.

The trial court submitted both a liability and a damage question to the jury. The jury determined that the City took TCLC's airspace rights by overflights associated with the operation of the airport and determined the fair market value of the land after the taking to be $6,850,000, a sum between the two valuations presented by the experts.

5. A Type I landfill permits "putrescible" waste, such as household garbage. These types of landfills attract rodents and birds. Because it was not in the direct flight path of the two airport runways, the City was able to operate its landfill as a Type I landfill when the military operated the airport. When Bergstrom became a municipal airport, the FAA required the City's landfill to operate as a Type IV landfill.

6. Bergstrom objected to the Company's original intent to operate a Type I landfill because a Type I landfill, located directly under the flight path of one of Bergstrom's runways, created the risk of birds interfering with take-offs and landings.

The City moved for judgment notwithstanding the verdict, but the trial court denied the motion.[7] The trial court rendered judgment for TCLC and awarded it $2,950,000 in damages, the difference found by the jury in the property's value before and after the taking. The court denied TCLC's request for injunctive relief and attorney's fees. TCLC asked the court to make findings of fact and conclusions of law in support of the final judgment. The trial court concluded as a matter of law that, "[b]eginning on or about June 30, 1997, TCLC's superadjacent [sic] airspace rights were taken by regular and frequent overflights conducted in connection with the operation of [the airport]." The City appeals the trial court judgment in six issues, arguing in the first five issues that the trial court erred by denying the grounds stated in its motion for judgment notwithstanding the verdict, and arguing in its sixth issue that the trial court erred in its charge to the jury. TCLC also appeals the trial court judgment. In two issues, TCLC contends that the trial court abused its discretion by failing to enjoin overflights by the airport pending the City's payment of compensation and by failing to award TCLC attorney's fees.

## DISCUSSION

The City has consistently characterized TCLC's claim as a complaint that the height restrictions burdening its property prohibit it from expanding a landfill as high as it wishes. TCLC, on the other hand, alleged and proved to the jury's satisfaction that the City took its property by overflights; in other words, TCLC's complaint is based on the physical intrusion of aircraft into the airspace over its land. The City's desire to focus on the height restrictions burdening TCLC's

property does not change the nature of the case pleaded and proved by TCLC. Therefore, we must determine whether the City's issues prove reversible error in the takings case presented to the jury.

## I. City's Appeal

### Height Restrictions on TCLC's Land

At common law, "ownership of the land extended to the periphery of the universe." *United States v. Causby,* 328 U.S. 256, 260, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). Modern law, however, gives "exclusive sovereignty of airspace of the United States" to the federal government, and gives United States citizens "a public right of transit through navigable airspace." 49 U.S.C.A. § 40103(a)(1), (2) (West 1997). "Navigable airspace" means "airspace above the minimum altitudes of flight" prescribed by federal regulations, "including airspace needed to ensure safety in the takeoff and landing of aircraft." *Id.* § 40102(a)(30); *see also* 14 C.F.R. § 1.1 (1999). The Federal Aviation Administration ("FAA") has established the minimum altitude of flight as heights of 500 feet above ground level for uncongested areas and 1000 feet for congested areas. 14 C.F.R. § 91.119 (1999).

Much of the airspace over TCLC's land, including the airspace under 500 feet, is navigable airspace because it is needed to ensure safety in the takeoff and landing of aircraft utilizing the south end of airport runway 35L. Trial testimony established that pilots are required to follow a "glide slope" when they are landing aircrafts using their instruments, as opposed to their sight.[8] *See Persyn v. United States,* 34 Fed. Cl. 187, 198 (1995), *aff'd,* 106 F.3d 424 (Fed.Cir.1996) (defining the term "glide

---

7. The trial court had also submitted to the jury a question regarding attorney's fees for TCLC. In its motion for judgment notwithstanding the verdict, the City argued that no statutory authority exists for the award of attorney's fees to TCLC. The trial court granted this part of the motion, which we will discuss when we review TCLC's appeal.

8. A pilot landing under visual conditions may use his or her discretion in deciding whether to follow the glide slope, although the pilot has to fly "close" to it.

slope"). The glide slope for runway 35L, established by the FAA, begins at 495 feet over the south end of TCLC's property and slopes down to 223 feet over the north end of the property, which is the area of the property closest to the runway. The FAA has also defined a number of "imaginary surfaces" for civil airports. *See* 14 C.F.R. § 77.25 (1999). One such surface is the "approach surface." *See id.* The approach surface for runway 35L begins at approximately 100 feet over the south end of TCLC's land and slopes down to approximately 35 feet above the north end of the land. The Easement, discussed above, permits the City to keep the approach surface over TCLC's land free of any obstacles. Thus, the imaginary surface acts as a ceiling over the land, and the Easement prohibits obstructions from extending above that ceiling.

TCLC's land is thus burdened by federal regulations defining the land's superjacent airspace as navigable airspace. The City claims in its first issue that TCLC suffered no harm when the airport began operations in 1997 because federal law has restricted the airspace over the subject property since 1958, when Congress first defined "navigable airspace" to include airspace needed for safe takeoff and landing. The City makes similar claims in its third and fifth issues by arguing that a previous owner of the subject property was compensated for the height restrictions now burdening TCLC's land when the previous owner sold the Easement to the federal government in 1982, and that an Ordinance passed by the City, which prohibits the building of any structure or object into federal navigable airspace, is a legitimate exercise of the City's police power.

In 1962, the United States Supreme Court held that frequent low level flights over a person's property may constitute a taking, regardless of whether the airspace above the landowner's property constitutes federal navigable airspace. *See Griggs v. County of Allegheny,* 369 U.S. 84, 88–90, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). In

*Griggs,* the approach area for one of the runways passed over the landowner's home; flights taking off passed from 30 feet to 300 feet over the residence, while flights landing traveled from 53 feet to 153 feet over the home. *See id.* at 87, 82 S.Ct. 531. The Court relied on *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) to hold that flights through navigable airspace can constitute a compensable taking.

█ In *Causby,* the Court noted that airspace is a "public highway"; however,

[I]t is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise, buildings could not be erected, trees could not be planted, and even fences could not be run.... The superadjacent [sic] airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. We think that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface.

328 U.S. at 265, 66 S.Ct. 1062. The Court concluded that "the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it." *Id.* at 264, 66 S.Ct. 1062. Thus, according to *Causby, Griggs,* and their progeny, a compensable taking by overflight may occur when frequent and low flights by aircraft cause direct, immediate, and substantial interference with the property owner's use and enjoyment of the land. *See Griggs,* 369 U.S. at 89–90, 82 S.Ct. 531; *Causby,* 328 U.S. at 266, 66 S.Ct. 1062; *Brown v. United States,* 73 F.3d 1100, 1102 (Fed.Cir.1996).

Texas cases have cited *Griggs* to find that low overflights may result in the taking of an air easement. In *City of Houston v. McFadden,* 420 S.W.2d 811 (Tex.Civ. App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.), McFadden sued the City of Hous-

ton for taking his property as a result of the City's operation of Houston International Airport. The City constructed a new, longer runway for jet propelled aircraft after McFadden purchased his property and built a home near the airport. The jet airplanes flew at low altitudes over McFadden's home when taking off and landing, causing physical damage to McFadden's home. The court of appeals, citing *Griggs*, noted, "This type of action has been recognized and approved as a 'taking' of property, in the constitutional sense, in the nature of an air easement for which compensation must be made." *McFadden*, 420 S.W.2d at 814; *see also Sjolander v. City of Houston*, 551 S.W.2d 166, 168 (Tex.Civ.App.—Houston 1977, no writ). More recently, the Texas Supreme Court has noted that this cause of action exists. *See Felts v. Harris County*, 915 S.W.2d 482, 486 (Tex.1996) (distinguishing highway traffic noise case from "cases involving airplane overhead flights ... [which] involve the 'taking' of air easements ....") (citing *McFadden*, 420 S.W.2d at 814).

■ The City's argument that federal height restrictions have long burdened TCLC's land thus does not foreclose TCLC's claim that the City has taken its property by physically intruding into the airspace immediately above its land. We believe this conclusion is supported not only by case law but also by the federal agency imposing the height restrictions on the land. FAA Advisory Circular 150/5100–17 (the "FAA Advisory Circular") describes avigation easements and explains that such an easement may be used to "secure airspace for airport and runway approach protection." United States Department of Transportation, Federal Aviation Administration, *Land Acquisition and Relocation Assistance for Airport Improvement Program Assisted Projects*, Advisory Circular 150/5100–17 ¶ 2–7(a) (March 29, 1996).[9] Paragraph 2–7(b) explains that "Avigation easements are typically acquired for airspace requirements ... including the approach area." *Id.* ¶ 2–7(b). This FAA Advisory Circular supports our holding that, even though the airspace immediately over one's land may be federal navigable airspace because it is needed for safe takeoffs and landings, flights through such space may still constitute a taking for which compensation is due. The City's first issue is overruled.

■ The City alternatively claims that a previous owner was compensated for the height restrictions imposed by the Easement over TCLC's land. This argument also attempts to pigeonhole TCLC's overflights claim into a "taking by height restrictions" claim. We have explained above that federal and state case law permit a landowner to pursue a takings claim based on aircraft flying at low levels over its land. That is the claim TCLC alleged in its original petition and the claim before us in this appeal. We will therefore review whether TCLC's overflight complaint is barred by the Easement burdening its property.

The Easement begins by describing the federal "imaginary surfaces" over the subject property, specifically, the approach surface and the transition surface. It describes the manner in which these surfaces slope upward and lists specifically the height of the imaginary surfaces over different parts of the subject property. The Easement then grants the following rights on and above the described land: (1) the right "to trim or remove" those portions of trees, bushes, shrubs, or any other perennial growth "infringing upon or extending into or above the approach zone plane and

9. The FAA Circular explains that its purpose is to provide "guidance to sponsors of airport projects ... to meet the requirements of the Uniform Relocations Assistance and Real Property Acquisition Act of 1970 (Pl 91–646, as amended) and the Regulations of the Office of the Secretary of Transportation, 49 CFR Part 24." The FAA Circular also states that "[s]ponsor land acquisition ... shall comply [with 49 CFR Part 24] on any Federally assisted airport project funded" under the Airport Improvement Program.

the transitional zone as described above"; (2) the same right for any growth "which could in the future" extend into the described surfaces; (3) the right to "remove, raze, or destroy" portions of buildings, other structures, or land extending into the described surfaces; (4) the right to "prohibit the future construction of buildings or other structures" from extending into the described surfaces; and (5) the right of "ingress and egress over said land to effect and maintain the necessary clearance." These five rights are referred to as an "obstruction" easement or a "clearance" easement. As we explained above, the Easement also provides military aircraft the right of unobstructed passage in all airspace above the surface of the subject property. This right is referred to as an "avigation" easement.

■ The City argues that the trial court failed to specify whether the City had taken an obstruction easement or an avigation easement. The trial court concluded, however, that "TCLC's superadjacent [sic] airspace rights were taken by *regular and frequent overflights ....*" (Emphasis added.) Thus, in the event that such a specific finding is necessary, the trial court clearly specified that the City took an avigation easement by virtue of civilian overflights. The City contends, however, that it is the height restrictions imposed by the obstruction easement that prevent TCLC from vertically expanding its landfill; therefore, the trial court erred by permitting TCLC to maintain a takings claim on its theory that the avigation easement does not include the right to fly civilian operations over its land. We disagree. TCLC's takings claim is based on overflights. The City's obstruction easement does not give it overflight rights, and the avigation easement provides only military aircraft the right of unobstructed passage in the airspace above TCLC's land. *See Kearney & Son v. Fancher,* 401 S.W.2d 897, 905 (Tex.

Civ.App.—Fort Worth 1966, writ ref'd n.r.e.) (limited easement restricted to stated purpose); *see also Jefferson County v. Farris,* 476 S.W.2d 457 (Tex.Civ.App.—Beaumont 1972, orig. proceeding) (explaining that obstruction easement and avigation easement are separate and independent of one another). The FAA Circular discussed above acknowledges that an airport operator may need to acquire both an avigation easement and an obstruction easement. *See* FAA Circular no. 150/5100–17 ("Where right of flight is required, lesser rights, such as clearance easements, are not sufficient to protect an airport owner from future claims of property owners due to over flights."). The City's third issue is overruled.

■ The City contends in issue five that its Ordinance restricting the airspace around the airport is a valid exercise of its police power and thus cannot constitute a taking as a matter of law. Pursuant to the Texas Local Government Code, the City has the right to adopt, administer, and enforce extraterritorial airport zoning.[10] The Ordinance at issue creates zones around the airport identical to the federal imaginary surfaces established by the FAA, and limits the height of structures and trees in these zones. *See* City of Austin Ordinance No. 940421–J.

With this issue, the City once again attempts to confine TCLC's takings claim to the height restrictions burdening its property. We have already stated that TCLC's complaint is based on repeated civilian overflights for which the City obtained no easement. The City's Ordinance, which imposes identical height restrictions on TCLC's land as the Easement and the federal imaginary surfaces, does not give the City the right to direct civilian flights at low levels over TCLC's land. The Local Government Code gives the City authority to obtain an air easement over TCLC's land if "airport zoning regu-

---

10. The City is authorized to zone the airport, which is outside of the City's boundaries, pursuant to the Airport Zoning Act. *See* Tex. Loc. Gov't Code Ann. §§ 241.001–.903 (West 1999).

lations are not sufficient to provide necessary approach protection because of constitutional limitations." Tex. Loc. Gov't Code Ann. § 241.903 (West 1999). The City simply failed to obtain an air easement in this case. Issue five is overruled.

■ We have overruled the City's contentions that the height restrictions burdening TCLC's property bar its takings claim. The City has urged in issues one and three, however, the slightly different argument that overflights have not decreased the fair market value of TCLC's land. In its reply brief, the City argues that the manner in which the property was appraised for trial was improper. In essence, these complaints attack the damages awarded to TCLC. The City did not object to the type of evidence presented by TCLC's real estate appraiser, did not object to the court's charge on the fair market value of the remainder, and has not raised an independent issue regarding damages on appeal. However, because the City argued in its motion for judgment notwithstanding the verdict that overflights did not decrease the fair market value of TCLC's land and raises several arguments regarding whether overflights have decreased the fair market value of the land, we will address the damages question in the interest of completeness.

■ The City argues that the overflights have not caused TCLC the type of harm suffered by the plaintiffs in *Causby*, *Griggs*, and *McFadden*. In those cases, the landowners' homes were damaged and their sleep was interrupted, and the noise and proximity of the aircraft flying overhead rendered their homes virtually uninhabitable. In the instant case, TCLC has alleged that the overflights decreased the fair market value of its undeveloped property, which is permitted for a Type IV landfill. It has not claimed that the noise or vibrations from overflights have harmed the underlying property in any way.

Despite the difference between this case and earlier overflight cases, we hold that the trial court did not err in awarding TCLC damages on the facts before us in this case. Both the City and TCLC presented appraisers who testified that airport operations caused a decrease in the fair market value of TCLC's land for two reasons: TCLC's inability to vertically expand its landfill on one hand, but also the increased risk associated with operating a landfill in close proximity to a municipal airport.

■■ In partial taking cases, damages are measured by the "difference between (a) the value of the landowner's entire tract before the taking, and (b) the market value of the remainder after the taking, giving consideration to the uses to which the condemned part is to be subjected." *Westgate, Ltd. v. State*, 843 S.W.2d 448, 457 (Tex.1992). To determine the fair market value of the land before the taking, the fact that the land will be taken must not be considered. *See City of Fort Worth v. Corbin*, 504 S.W.2d 828, 830 (Tex.1974) ("The fact of condemnation itself is excluded; fair market value must, by definition, be computed as if there were no proceedings to eliminate that market."). The court in *Corbin* noted that this method involves a "hypothetical exercise." *Id.* at 830.

Holland Young, the Planning and Development Manager for the City's airport department, testified that under FAA guidelines the City was required to exclude consideration of the airport in valuing the property before the taking. Isabella Lauraine Rizer, the Chief Appraiser for the City's Real Estate Division, also testified that the City was required to adhere to federal guidelines for acquiring property for the airport, a federally funded project, and that one of those guidelines required the City to exclude from consideration the influence the project would have on the value of the land being taken.[11] She was

11. Some of the federal guidelines referred to

by both Young and Rizer are found in the

asked, "And if it's an airport that['s] going to have—cause overflights that's going to damage the value of the property, you don't take that into account, do you?" Rizer responded, "No." The independent appraiser called by the City, David Bolton, also testified that, when determining the value of the subject property before the taking, the project charged with taking the property should be excluded from consideration.

We have explained earlier that both Bolton and TCLC's expert, Clint Sayers, testified that, excluding the existence of the airport and its operations, TCLC's property had a fair market value of $9,800,000. Both experts also testified that, immediately after the taking, the fair market value of TCLC's property decreased. Bolton, the City's expert, testified that the decrease was due to TCLC's inability to vertically expand its landfill and an increased risk factor resulting from possible environmental and technological changes, as well as higher insurance. Sayers's testimony was similar, but his valuation of the property included an even higher risk factor than Bolton's. Sayers cited as reasons for the increased risks such things as possible changes in FAA regulations, and the manner in which the landfill operator would have to oversee the landfill in light of its proximity to a municipal airport. Bolton valued the remainder at $7,500,000; Sayers valued the remainder at $6,200,000; the jury valued the remainder at $6,850,000.

At trial, the City's appraiser agreed that the project influence rule was to be followed in appraising TCLC's property, and he presented evidence that the fair market value of TCLC's land decreased when the City began operating the airport. Therefore, the City cannot argue that airport operations did not decrease the fair mar-

ket value of TCLC's land, or that TCLC's evidence of the market value of its land before the taking, which excludes from consideration the existence of the airport, and its evidence of the value of the remainder, considering the use to which the land can be put with the airport in existence, is the wrong way to estimate damages in this case. It is the very evidence the City itself presented.

We note finally that even without the height restrictions burdening TCLC's property, frequent low level overflights would prevent TCLC from stacking its landfill into the airspace over its land. In other words, if the FAA and the City suddenly removed all of the height restrictions currently affecting TCLC's land, TCLC would still maintain that overflights alone diminished the value of its property. Furthermore, the City has not challenged either appraiser's testimony regarding the heightened risk the landfill owner will face operating the landfill with 100 civilian aircraft flying over the landfill every day. Therefore, any challenge the City may have preserved regarding the damages awarded to TCLC is overruled.

### The Court's Charge to the Jury

In the City's sixth issue, it complains that the trial court erred in submitting jury questions one and two. However, the City did not properly preserve at the trial court all the complaints embedded within this issue, nor has the City presented argument to support many of the complaints raised in the sixth issue.

In order to preserve error in the charge at the trial court, a party must either (1) object to the question, or (2) submit in writing to the trial court a substantially correct question, depending on whether the complaining party claims er-

previously mentioned FAA Advisory Circular, which states, "The appraisal of the property to be acquired shall disregard any decrease or increase in the fair market value of the real property caused by the project for which the property is to be acquired...." United

States Department of Transportation, Federal Aviation Administration, *Land Acquisition and Relocation Assistance for Airport Improvement Program Assisted Projects,* Advisory Circular 150/5100–17 ¶ 2–1(d) (March 29, 1996).

ror in a question on which it relied or in a question relied on by its opponent. *See* Tex.R. Civ. P. 278. The City did not object to question two, which asked the jury to determine the fair market value of TCLC land on the date overflights began. There is no request for a substantially correct version of question two in the record before us. Finally, the City presents no argument on appeal challenging any part of question two. *See* Tex.R.App. P. 38.1(h) (appellants' brief must contain argument for contentions made). Therefore, the challenge to question two is waived.

The City *did* object to question one, which is sufficient to preserve error regarding a defect in a question. *See* Tex.R. Civ. P. 272, 274. While the City's issue complains about the submitted question, however, the argument on appeal supporting this issue addresses only one of the three *instructions* accompanying question one:

### QUESTION NO. 1[12]

Beginning on or about June 30, 1997, has the City of Austin taken TCLC's airspace rights by overflights associated with the operation of the Austin–Bergstrom International Airport?

Airspace rights are taken by overflight if:

. . . .

(2) the flights regularly occur at altitudes below the normal safe level of flight (500 feet in uncongested areas, 1000 feet in congested areas);

. . . .

**Answer "Yes" or "No":**

**ANSWER:** *Yes*

■ The City contends that instruction two is erroneous because it "misstate[s] the law and rest[s] on the faulty premise that federal navigable airspace cannot exist below an altitude of 500 feet." We do not believe the City has properly preserved this complaint because there is no record of any "substantially correct definition or instruction" submitted by the City to the trial court. *See* Tex.R. Civ. P. 278.[13] In the event this complaint has been preserved, however, we hold that the trial court did not abuse its discretion by submitting this instruction. *See Texas Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990) (standard of review for jury charge is abuse of discretion). We have explained above that even though airspace below 500 feet may constitute federal navigable airspace, this does not eliminate a landowner's takings claim for overflights in that airspace. *See Griggs,* 369 U.S. at 87, 89, 82 S.Ct. 531; *Brown,* 73 F.3d at 1102 (court noted that the Browns' complaint was based on flights flying "less than 500 feet above ground level" over their property). While it may be preferable for a trial court to ask whether the flights occur at "low" altitudes, rather than at altitudes below the normal safe level of flight, the court did not act without reference to guiding legal principles in submitting this charge. The City's sixth issue is overruled.

### *Standing and Statute of Limitations*

■ In its second issue, the City argues that an obstruction easement placing height restrictions on the property was taken in the 1940s, when flights first began flying over the subject property, or in

---

12. The dissent concludes that instruction three to Jury Question Number One misstates the law and probably caused the rendition of an improper judgment. Although the City objected to this instruction at the trial court, it does not present any argument on appeal relating to instruction three and none of its arguments on appeal address this instruction. *See* Tex.R.App. P. 38.1(h) (appellants' brief must contain arguments for contentions

made). Therefore, we conclude that any complaint regarding instruction three is waived.

13. We note that the City's inclusion in its reply brief of an unfiled copy of its requested definitions or instructions cannot be considered because a filed copy of the same does not appear in the clerk's record.

1958, when Congress first defined the airspace over the subject property as federal navigable airspace. The City complains, therefore, that TCLC is not the proper party to bring this takings claim because only the owner of the property at the time of the original taking, either in the 1940s or 1958, is entitled to payment. In its fourth issue, the City argues that TCLC's takings claim is barred by the statute of limitations for the same reasons. These issues are not properly before this Court. First, they were not raised in the City's answer to TCLC's petition.[14] Furthermore, the City did not request a jury submission regarding the statute of limitations affirmative defense. *See* Tex.R. Civ. P. 279 (parties must submit questions regarding defenses in order to preserve error). The City's contention that it properly preserved these issues through its motion for judgment notwithstanding the verdict is without merit. Accordingly, issues two and four are overruled.

We have overruled all of the issues raised by the City in this appeal. Therefore, we affirm that part of the judgment finding the City liable to TCLC in the amount of $2,950,000. We now turn to the issues raised by TCLC in its role as appellant.

## II. TCLC's Appeal

### *TCLC's Request for Injunctive Relief*

■ In its motion for judgment on the verdict, TCLC requested the trial court to enjoin the City from directing or allowing commercial flights over its property until all monetary amounts awarded to TCLC were paid, or until the City deposited a security payable to TCLC into the registry of the Court. The trial court denied this request in the final judgment. TCLC now appeals the trial court's decision not to issue a permanent injunction against overflights pending final payment of the judgment.

■ Appellate review of a trial court judgment granting or denying a permanent injunction is strictly limited to a determination of whether there has been a clear abuse of discretion. *See Risk Managers Int'l, Inc. v. State,* 858 S.W.2d 567, 569–70 (Tex.App.—Austin 1993, writ denied); *Priest v. Texas Animal Health Comm'n,* 780 S.W.2d 874, 875–76 (Tex. App.—Dallas 1989, no writ). TCLC argues that the trial court abused its discretion by not issuing a permanent injunction in this case because it found that the City took TCLC's property yet refused to enjoin further physical possession of the property until the City compensated TCLC.

The Texas Constitution states:

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and *when taken,* except for the use of the State, *such compensation shall be first made, or secured by a deposit of money* . . . .

Tex. Const. art I, § 17 (emphasis added). Thus, the Texas Constitution requires a political subdivision of the State, such as the City, to compensate the landowner or deposit a security before it takes property for public use. In this case, the City did neither, and TCLC brought the instant inverse condemnation proceeding seeking compensation. When a party brings inverse condemnation proceedings against a political subdivision of the state, the political subdivision is permitted by statute to counterclaim and either assert a claim to the property or seek to condemn the property. *See* Tex. Prop.Code Ann. § 21.017 (West 1984). If the party seeks injunctive relief against the political subdivision, the trial court may grant the injunction or, instead of granting the injunction, "a court may require a condemnor to provide security adequate to compensate the property

---

**14.** The City did plead the affirmative defense of statute of limitations, but it asserted different dates in the 1990s as the start of the limitations period.

owner for damages that might result from the condemnation." *Id.* § 21.064.

In this case, the City did not assert a counterclaim to condemn the property, and in the final judgment, the trial court did not enjoin the City from further overflights. TCLC argues that by not asserting a counterclaim, the City abandoned its opportunity to provide a security deposit in lieu of being subjected to an injunction as provided by Property Code section 21.064. TCLC contends that because the trial court failed to issue a permanent injunction against overflights, the City has been rewarded for its failure to institute a lawful condemnation proceeding because it has not had to post a security deposit and it is not enjoined from further overflights. TCLC urges that because it has prevailed in its takings claim against the City, denying its request for injunctive relief conditioned upon a security deposit offends the Texas Constitution by permitting the City to take TCLC's property rights without prior compensation.

Texas case law supports TCLC's position. In *Brazos River Conservation & Reclamation District v. Costello*, 135 Tex. 307, 143 S.W.2d 577 (1940), the trial court enjoined the District from actions that would take the complaining landowner's property. The District filed a cross-action to condemn the subject property under the authority of article 3269, the predecessor statute to Property Code sections 21.017 and 21.064.[15] The District offered to pay a security into the registry of the court as the court might deem proper; the trial court determined a sum but nonetheless did not dissolve the injunction against the District. *Costello*, 143 S.W.2d at 578. The court of appeals affirmed the trial court's decision, holding that if article 3269 permitted the District to condemn by crossaction, the article was unconstitutional "because it would permit the dissolution of the injunction and the taking of properties"

without providing for payment of damages, and it left to the discretion of the trial court whether any security should be deposited. *See id.* at 579. The court of appeals also held that "in no event should the State take the private property of individuals, leaving the owners to depend upon the discretion of a trial court as to the giving of security in advance of the taking." *Id.*

The supreme court reversed the court of appeals, holding that article 3269 should be read in connection with article I, section 17. *See id.* at 580. Construing it in this manner led to the conclusion that "the court, in the exercise of its power, *must require* that every prerequisite of the Constitution be fully complied with before a person's property can be applied to public use. The statute as thus construed does not violate the Constitution of this State." *Id.* (emphasis added). The court went on to hold that since the District was "ready, willing, and able" to deposit a security, "when said District has deposited in cash the sum allowed the landowners by said court ... the said writ of injunction issued by the trial court shall be dissolved." *Id.*

In *Koslosky v. Texas Electric Service Co.*, 213 S.W.2d 853 (Tex.Civ.App.—Eastland 1948, writ ref'd), the court cited *Costello* when it stated: "Where property is taken, compensation therefor must be paid in advance or payment thereof secured. Unless such compensation is paid in advance, or unless Article 3269 ... is complied with, an injunction should be issued to prevent such taking." *Id.* at 854–855.

In the cases discussed above, the injunctions were ordered to be dissolved once the taking entity posted a security deposit. *See Costello*, 143 S.W.2d at 580; *Koslosky*, 213 S.W.2d at 855. In this case, the entity charged with the taking is neither enjoined from further possession of the property nor is it required to deposit a security pending final resolution of the claim. We

---

15. *See* Tex.Rev.Civ. Stat. Ann. art. 3269 (West 1968), *repealed by* Act of May 24, 1983, 68th Leg., R.S., ch. 576, § 6, 1983 Tex. Gen. Laws 3475, 3729 (codified at Tex. Prop.Code Ann. §§ 21.017, .064 (West 1984)).

need not determine whether case law interpreting the Texas Constitution mandates the trial court to issue an injunction in this situation, however, because we believe that federal law preempts any state law requirement that a permanent injunction issue to prohibit continued overflights.

■ To determine whether state law or judicial action conflicts with federal law, this Court must decide whether compliance with both state and federal law is impossible or whether the state law stands as an obstacle to the full objectives of Congress. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). As we explained in our discussion of the City's appeal, the United States Code provides:

> **§ 40103. Sovereignty and use of airspace**
>
> **(a) Sovereignty and public right of transit.**—(1) The United States Government has exclusive sovereignty of airspace of the United States.

49 U.S.C.A. § 40103(a)(1) (West 1997). Congress has given the FAA authority to regulate flights through federal navigable airspace. *See id.* § 40103(b). Although the United States Supreme Court has given landowners the right to compensation when flights through superjacent airspace are so low and frequent as to constitute a taking, *see Griggs*, 369 U.S. at 89–90, 82 S.Ct. 531; *Causby*, 328 U.S. at 266, 66 S.Ct. 1062, these cases do not extend to landowners the right to enjoin the overflights. *See United States v. City of New Haven*, 367 F.Supp. 1338 (D.Conn.1973) (holding that state court had no power to enjoin airport operations).

TCLC argues that federal regulations support its position that it is entitled to an injunction against continued overflights. FAA Order 5100.37A ("FAA Order") instructs an airport owner to "take the necessary action to file for condemnation" and states: "The airport owner shall not intentionally make it necessary for the property owner to institute legal proceedings to prove the fact of the taking of the real property." United States Department of Transportation, Federal Aviation Administration, *Acquisition and Relocation Assistance for Airport Projects*, Order 5100.37A ¶ 3–34 (April 4, 1994). The FAA Order also states that "in the case of condemnation," the airport owner "shall ... deposit with the court ... the court award of compensation in the condemnation proceeding for the property." *Id.* We have also noted previously that FAA Advisory Circular 150/5100–17 instructs airport owners that avigation easements should be acquired for the approach area.

We agree that these federal guidelines instruct airport sponsors on the process to follow when acquiring needed property rights; however, the regulations do not manifest an intent that an airport sponsor be enjoined from directing flights through federal navigable airspace when the guidelines are not followed. The only intent we discern from federal law applicable to TCLC's request for an injunction is Congress's statement that the United States has exclusive sovereignty over the airspace. A Texas state court may not assume authority over the airspace by issuing an injunction against further overflights in light of this federal law. Thus, under the facts of this case, we decline to hold that the trial court abused its discretion by denying a permanent injunction against further flights through the airspace over TCLC's land. TCLC's first issue is overruled.

**Attorney's Fees**

■ The trial court denied TCLC's request for attorney's fees, stating in the judgment: "Attorney's fees and expenses are not awarded to Plaintiff due to the absence of statutory authority." In its second issue, TCLC contends this was error. We must disagree.

■ Recovery of attorney's fees is adverse to the common law and penal in nature, and statutes providing for such recovery must be strictly construed. *See*

*New Amsterdam Cas. Co. v. Texas Indus. Inc.,* 414 S.W.2d 914, 915 (Tex.1967); *Van Zandt v. Fort Worth Press,* 359 S.W.2d 893, 895 (Tex.1962). Texas law provides no statutory authority for awarding attorney's fees in inverse condemnation claims arising under Article I, section 17 of the Texas Constitution. *See State v. Biggar,* 848 S.W.2d 291, 298 (Tex.App.—Austin 1993), *aff'd,* 873 S.W.2d 11 (Tex.1994).

■ TCLC does not dispute the general rule. It argues, however, that relevant federal law provides the statutory authority allowing it to recover attorney's fees under its state inverse condemnation claim, citing the Uniform Relocation Assistance and Real Property Act ("Uniform Act"), 42 U.S.C.A. §§ 4601–4655 (West 1995). The Uniform Act is a federal statute that provides for the recovery of litigation expenses, including attorney's fees, by plaintiffs who instigate inverse condemnation proceedings under section 1346(a)(2) or 1491 of Title 28 [16] of the United States Code. The relevant section states:

§ 4654. **Litigation expenses**

. . . .

**(c) Claims against the United States**

The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . . such sum as will . . . reimburse such plaintiff for his reasonable costs; disbursements; and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C.A. § 4654.

Thus, section 4654 provides authority for the award of attorney's fees and expenses in actions brought in either federal court or the Court of Federal Claims. The Uniform Act contains no express authority for a similar award for state causes of action filed in state court. Further, the federal regulation implementing the Uniform Act, cited by TCLC as supporting its claim, likewise provides no express grant of authority. The relied upon regulation states:

24.107 **Certain litigation expenses.**

The owner of real property shall be reimbursed for any reasonable expense, including reasonable attorney, appraisal, and engineering fees, which the owner actually incurred because of a condemnation proceeding, if:

. . . .

(c) The court having jurisdiction renders a judgment in favor of the owner in an inverse condemnation proceeding or the Agency effects a settlement of such proceeding.

49 C.F.R § 24.107 (1998). The regulations define the term "Agency" as "the Federal Agency, State, State agency, or person that acquires real property," while the term "State agency" is defined as, among other things, "a political subdivision of a State." *Id.* § 24.2(a), (a)(1). At most, section 24.107 clarifies that section 4654 applies to governmental entities facing claims in federal court or the Court of Federal Claims. It does not provide statutory authority for state courts to award attorney's fees for successful inverse condemnation claims arising under state law.

Only one other statutory provision might be construed as authorizing the award of attorney's fees, that being section 4655, which provides:

§ 4655. **Requirements for uniform land acquisition policies**

---

**16.** 28 U.S.C.A section 1346(a)(2) provides that federal district courts have original jurisdiction, concurrent with the United States Court of Federal Claims, over certain civil actions against the United States, while section 1491 provides that the Court of Federal Claims has jurisdiction to render judgment upon any claim against the United States founded upon, among other things, the federal constitution. *See* 28 U.S.C.A. §§ 1346(a)(2), 1491 (West 1994 & Supp.1998).

**(a) Payments of expenses incidental to transfer of real property to State[17]**

Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to ... an acquiring agency [18] under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property ... unless he receives satisfactory assurances from such acquiring agency that—

(1) in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 4651 ... and ... section 4652 of this title.[19]

(2) property owners will be paid or reimbursed for necessary expenses as specified in sections 4653 and 4654 of this title.

42 U.S.C.A. § 4655 (emphasis added). By its terms, the Uniform Act prohibits a federal agency from approving any federally funded project in which a political subdivision of a state acquires real property without assuring that the acquiring political subdivision will (1) follow the land acquisition policies of the Uniform Act, to the extent possible under State law; and (2) reimburse property owners for litigation expenses should the property owner be forced to institute inverse condemnation proceedings.

17. "State" is defined as, among other things, "any political subdivision" of any State of the United States. 42 U.S.C.A. § 4601 (West 1995).

18. "Acquiring agency" is defined as a State agency that has the authority to acquire property by eminent domain under State law. 42 U.S.C.A. § 4655(b) (West 1995). A "State agency" is defined by the statute as, among other things, "a political subdivision of a State." *Id.* § 4601.

19. Section 4651 requires Federal agencies to exclude from consideration any increase or decrease in the fair market value resulting from the public project for which the property

Thus, section 4655 governs the relationship between the City and the federal agency from which it seeks federal funds. It does not create a landowner's cause of action for attorney's fees in the event the City fails to comply with the land acquisition policies outlined in the statute. *See City of Buffalo v. Clement,* 45 A.D.2d 620, 360 N.Y.S.2d 362, 366 (1974) (holding that section 4655 prescribes conduct between federal agencies and state agencies in condemnation actions involving federal funds).

Because we find no statutory authority for an award of attorney's fees or litigation expenses in TCLC's state inverse condemnation claim, the trial court did not err by refusing to award them. TCLC's second issue is overruled.

**CONCLUSION**

We have overruled the City's and TCLC's issues. The trial court judgment is affirmed.

JAN P. PATTERSON, Justice, dissenting.

This case presents the question of whether the owner of an undeveloped landfill site south of the Austin–Bergstrom International Airport is entitled to compensation for property "taken" by overflights.[1] The landfill site was purchased by the landowner after the airport referendum and subject to a clearance easement prohibiting the building of structures above a

is to be taken. *See* 42 U.S.C.A. § 4651 (West 1995).

1. In May 1993, the City's voters approved a referendum relocating the new municipal airport to Bergstrom Air Force Base. In September 1993, ownership of Bergstrom Air Force Base officially reverted to the City. In December 1993, TCLC purchased the subject property and acquired the Type IV landfill permit for the property. Military flights continued out of the airport until 1996. Air cargo operations began at ABIA on or about June 30, 1997, which is the date TCLC alleges the taking occurred for which it should be compensated.

certain height. Because the landowner's right to the use and enjoyment of the land is limited by the clearance easement and the landowner's entitlement to compensation turns on (i) the extent of its interest in the property and (ii) whether the overflights substantially interfered with its use and enjoyment of the land, I conclude that the jury was improperly instructed on the law and the error probably caused the rendition of an improper judgment.[2] For these reasons, I respectfully dissent.

Although the upper reaches of the atmosphere are in the public domain and the surface owner's title is subject to the right of public passage, a landowner's property interest in the land extends to the airspace over the property to the extent the airspace can be used to benefit the underlying land. Because TCLC, the landowner here, owns its land subject to a clearance or obstruction easement, however, it no longer has the unlimited right, *inter alia*, to build into the airspace above its land.

The Supreme Court first addressed the problem of whether overflights constitute a taking in *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). Concluding that not every violation of an owner's airspace constitutes a taking, the Court stated: "Flights over private land *are not* a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." (Emphasis added.) *Id.* at 266, 66 S.Ct. 1062. The Court concluded that low flights of the government's planes through the superjacent airspace of the landowner constituted a taking because the flights were destructive of the landowner's poultry business and disruptive of his family's peace and quiet. The Court found that an easement in plaintiff's land was taken when heavy bombers from a neighboring airbase, upon takeoff and landing, frequently passed over the landowner's property as low as 63 feet above his barn and 67 feet above his house. Because chickens were killed and production from the remaining fowls fell off, the use of the land as a commercial chicken farm was destroyed and the family had to give up its chicken business. The family members were deprived of sleep and became nervous and frightened. On the basis of these facts, the Court found that an easement had been taken and compensation was required.

The Court considered three factors significant in determining whether overflights interfered with the property owner's rights in such a way as to constitute a "taking" that would require compensation: (i) the planes flew directly over the claimant's land; (ii) the flights were low and frequent; and (iii) the flights directly and immediately interfered with the claimant's enjoyment and use of the land. *Id.* at 266, 66 S.Ct. 1062.[3] The Court recognized that the use and enjoyment of the property need not be completely destroyed to constitute a taking. Hence, "[t]he path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value." *Id.* at 262, 66 S.Ct. 1062.

Likewise, in *Griggs v. County of Allegheny*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), the Supreme Court found that low altitude flights made the land "unbearable" for the landowning family's residential use. The Court described the noise of the planes as comparable to the noise of a riveting machine or steam hammer which

---

2. *See* Tex.R.App. P. 44.1(a). *See also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex.1995); *Island Recreational Dev. Corp. v. Republic of Tex. Savings Ass'n*, 710 S.W.2d 551, 555 (Tex.1986).

3. *See also Brown v. United States*, 73 F.3d 1100, 1103 (Fed.Cir.1996); *Speir v. United States*, 202 Ct.Cl. 1020, 485 F.2d 643, 646–47 (1973); *A.J. Hodges Indus., Inc. v. United States*, 174 Ct.Cl. 259, 355 F.2d 592, 595–96 (1966) (citing *Causby*).

made it often impossible for people in the house to talk on the telephone or even to converse at all. The family would frequently be awakened at night by the noise of planes, the windows would rattle, plaster would fall from the walls and ceilings, and the family's health was impaired. Relying on *Causby*, the Court held that the county had "taken" an air easement for which it must pay just compensation. *See* 369 U.S. at 88–90, 82 S.Ct. 531; *see also City of Houston v. McFadden*, 420 S.W.2d 811, 814 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.) (taking found due to noise, lights, physical damage to property of homeowner, and intense vibrations caused by low-flying overflights).

The majority relies on *Causby*, *Griggs*, and *McFadden* to find a "taking" even though it finds that TCLC "has not claimed that the noise or vibrations from overflights have harmed the underlying property in any way" and alleges only "that the overflights decreased the fair market value of its undeveloped property." The majority confuses a measure of damages for the very existence of the harm. But the law is clear that low flights, in and of themselves, do not constitute the basis of a cause of action. *See, e.g., United States v. Brondum*, 272 F.2d 642, 646 (5th Cir.1959) (citing *Causby*). The ultimate question is whether there was sufficient

interference with the landowner's use and enjoyment of the property to constitute a taking. *See Speir v. United States*, 202 Ct.Cl. 1020, 485 F.2d 643 (1973). Article I, Section 17 does not require compensation for every decrease in market value attributed to a governmental activity. *See Felts v. Harris County*, 915 S.W.2d 482, 484 (Tex.1996); *State v. Schmidt*, 867 S.W.2d 769, 774 (Tex.1993). TCLC has cited no case in which a decrease in market value alone constitutes a taking requiring compensation.[4] The diminution of the market value of the property becomes relevant only where a landowner has demonstrated a direct and substantial invasion of his property rights of such a magnitude that he is deprived of the use and enjoyment of his property.

At trial, the City objected on numerous grounds to the following question included in the court's charge:

## QUESTION NO. 1

Beginning on or about June 30, 1997, has the City of Austin taken TCLC's airspace rights by overflights associated with the operation of the Austin–Bergstrom International Airport?

Airspace rights are taken by overflight if:

4. TCLC mistakenly relies upon *Brown v. United States*, 73 F.3d 1100 (Fed.Cir.1996), for the proposition that the third prong of the "takings" test allows for a finding that a substantial decrease in market value alone is an alternative measure of loss of the use and enjoyment of land. *Causby* makes clear that diminution in value is simply a part of the loss of use and enjoyment or exploitation of the land and not a separate test. *See United States v. Causby*, 328 U.S. 256, 262, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). *Brown* does not alter the takings test first enunciated in *Causby*. It simply recognizes that an important element in a landowner's right to the use and enjoyment of his land, i.e., a property owner's "bundle of rights," is the right to economically exploit the land in the future. The Browns operated a ranch for hunting and cattle raising on 6858 acres. They asserted that overflights substantially interfered with the enjoyment and use of 100 acres of their

property for recreational purposes and had limited their use of that acreage to agricultural purposes. The trial court found that the Browns had not shown substantial interference with their *present* enjoyment and use of the overflown surface property. Concluding that the trial court's definition of use and enjoyment was too restrictive and that a question of fact existed as to whether there was a substantial interference with their use and enjoyment of the land, the court of appeals reversed. The court recognized that "uses which have been recognized and valued by the market *before the overflights*" were part of the bundle of rights in the land that a landowner possessed. The court noted: "Any takings analysis is of course directed to that part of the property characterized by low and frequent overflights. The trial court found, and the parties do not dispute, that this area comprises roughly 100 acres of the Brown's property." 73 F.3d at 1105.

(1) the flights are frequent and recurring and are not isolated or sporadic;

(2) the flights regularly occur at altitudes below the normal safe level of flight (500 feet in uncongested areas, 1000 feet in congested areas); and

(3) the flights result in a substantial interference with the owner's ability to use and enjoy his property or if the overflights result in a substantial decrease in the market value of the property.

As discussed above, a taking by overflights requires compensation when the *Causby* factors are satisfied. The instructions as given attempted to set forth the law of taking by overflights. The City correctly objected to instructions (2)[5] and (3) as misstatements of the law and have raised both of these as issues on appeal.

An instruction is improper if it misstates the law or misleads the jury. To determine whether an alleged error in the submission of instructions or definitions is reversible, we must consider "the pleadings of the parties, the evidence presented at trial, and the charge in its entirety." *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). Error will be deemed reversible error only if, when viewed in light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party "as was reasonably calculated and probably did cause the rendition of an improper judgment." *Id.* at 555. By inclusion of the phrase "or if the overflights result in a substantial decrease in the market value of the property," the instruction is an improper statement of the law. I believe that it was also reasonably calculated and probably did cause the rendition of an improper judgment because the jury was given an alternative ground on which to find the existence of a "taking."

The majority also dismisses the City's argument that the trial court erred by failing to specify whether the disputed easement was a clearance easement or an avigation easement. They conclude that the City *took* an *avigation* easement by overflights and conclude that the height restrictions of the clearance easement were immaterial.[6] As a matter of law, the distinction between a clearance easement and an avigation easement is a critical determination for the jury to make with guidance from the trial court.

Since 1982, when TCLC's predecessors in title voluntarily conveyed to the federal government an easement, the property has been burdened by a perpetual and assignable clearance easement which allows the

---

**5.** Instruction (2) provides that a right is taken by overflight if "the flights regularly occur at altitudes below the normal safe level of flight (500 feet in uncongested areas, 1000 feet in congested areas)." This is a misstatement of the law and rests on the faulty premise that federal navigable airspace cannot exist below an altitude of 500 feet. For purposes of take-off and landing, navigable airspace exists below the altitude stated in the charge. The instruction also fails to recognize TCLC's limited rights to exclusivity in this airspace by reason of the clearance easement.

**6.** The City argues that a clearance easement placing height restrictions on the subject project was taken either as early as the 1940s when military aircraft began flying continuously over the property or in 1958 when the Federal Aviation Act was passed which placed height restrictions on the property. Because of its theory that an easement existed long before the Deed of Easement, the City contends that the Deed of Easement is not necessary to the disposition of this case. The City argues that TCLC should not now be permitted to complain of height restrictions that have long burdened the subject property which it purchased with full knowledge that the federal government had already transferred title for the airport to the City for use as a civilian airport. In light of the express grant of the clearance easement in 1982, however, I have not addressed the City's alternative theories. Regardless of the City's arguments that the TCLC property has been subject to frequent low-level overflights since the 1940s or that the property's use has been restricted by federally mandated imaginary surfaces since 1958, the undisputed fact remains that TCLC purchased the property in question *after* the property reverted back to the City and *after* the airport referendum.

grantee the various rights summarized in the majority opinion, including "the right to remove, raze, or destroy those portions of building [sic], other structures, and land extending into or above the approach zone plane and the transitional zone" and "the right to prohibit the future construction of buildings or other structures from infringing upon or extending into or above the approach zone plane and the transitional zone." It is undisputed that the City acquired the easement when the air force base closed.[7] Thus, the right to build a structure into the airspace on the land is part of TCLC's "bundle of rights" only to the extent it does not violate the clearance easement.[8]

There is no ambiguity in the description of the *clearance* easement. Although TCLC refers to the two easements as a single "military" easement, there is no mention of the right to fly over the land nor is there a mention of a limitation to military flights. In plain words, the federal government sought to acquire the right to cut trees and natural growth to a prescribed height and to remove and prohibit construction of buildings or other structures above a prescribed height. This distinctive type of easement or "estate" in the property is referred to as a clearance or "flight obstruction" easement, *see United States v. 48.10 Acres of Land,* 144 F.Supp. 258 (S.D.N.Y.1956), or described as a "ceiling," which "has but one function ... and that is to serve as the ceiling over the land in question beyond which obstructions or structures may not be allowed to extend upward into the adjacent air space." *United States v. 4.43 Acres of Land,* 137

F.Supp. 567, 569 (N.D.Tex.1956).[9] TCLC correctly contends that a clearance easement does not confer any attendant right to fly through or over it.

In addition to the clearance easement, however, the Deed of Easement also granted the federal government an avigation easement but limited the easement to military aircraft. The avigation easement conveyed the following rights:

> the right of unobstructed passage of all military aircraft and aircraft operated under military control (aircraft being defined for the purpose of this instrument as any contrivance now known or hereafter invented, used or designed for navigation or flight in the air) in all air space above the surface of Grantors' property, the number of passages not to exceed 60,900 per year; together with the right to cause in all air space above the surface of Grantors' property such noises, vibrations, fumes, fuel particles, and such other related effects as may result from the operation of aircraft landing at, taking off from, or operating at or on Bergstrom Air Force Base, notwithstanding the extent of interference which such noises, vibrations, fumes, fuel particles, and such other related effects, may cause to the use of Grantors' remainder estate.

The Grantors further agreed to hold the United States harmless "for any claim by grantors for interference with the *use and enjoyment* of property located beneath the property described above which interference is caused by the passage of aircraft operating within the scope of this easement." (Emphasis added.)

---

7. TCLC does not contend that the City has abandoned or otherwise extinguished the easement. TCLC argues that the clearance easement cannot be assignable to the City because the avigation rights in the easement are restricted to military aircraft. This ignores the clear language of the Deed of Easement and the law of easements.

8. The owner of the property over which the easement runs can make any use of the land that he wants but he cannot interfere with the

reasonable and necessary enjoyment of the easement. *See Rhodes v. Whitehead,* 27 Tex. 304 (1863).

9. "The purpose of the ceiling is to increase the margin of safety for flying by assuring that the glide zone will be free from natural growth or man-made obstructions and the pilot's vision unobscured above a designated altitude." *United States v. Brondum,* 272 F.2d 642, 644–45 (5th Cir.1959).

The avigation rights in the Deed of Easement, then, are distinct from the height restrictions of the clearance easement imposed on the subject property, and it is only the latter that allegedly prevents TCLC from vertically expanding its unopened landfill. While there is a question as to whether the *avigation* easement terminated when the land reverted to the City,[10] there is no question that the height restrictions in the Deed of Easement are perpetual, assignable, and unrelated to the type of aircraft passing over the subject property.

Thus, by its clear language, the 1982 Deed of Easement grants a clearance easement and, "in addition," an avigation easement limited to military aircraft. Because the jury was not instructed on the distinction between these two estates in land and their effect on the issue of a "taking," the instruction was improper. *Causby* makes clear that no taking occurs by the flight of aircraft in and of itself. Because the City possesses at least a perpetual clearance easement, the charge was incorrect. If a taking has occurred, it must be shown that TCLC's use and enjoyment of the land was substantially impaired apart from the limitations imposed on it by the clearance easement.[11]

I respectfully dissent.

---

10. An easement may be limited to a specific use and an avigation easement to a type of aircraft or operation. *See Branning v. United States,* 228 Ct.Cl. 240, 654 F.2d 88 (1981), aff'd, 784 F.2d 361 (Fed.Cir.1986). A change resulting in more extensive aircraft operations constitutes a taking of a more extensive easement. *See Avery v. United States,* 165 Ct.Cl. 357, 330 F.2d 640 (1964).

11. It may well be that TCLC is entitled to be compensated for the taking of some portion of its airspace, but because a prior owner of the subject property was compensated for the easement that placed height restrictions on the property, they can only be compensated for that portion of their interest in the land that was "taken" from *them*. *See Griggs v. County of Allegheny,* 369 U.S. 84, 88, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). Indeed, this Court, in denying TCLC's request for injunctive relief before trial, concluded that there was no evidence that "the few civilian overflights currently taking place have injured [TCLC] in its ownership or possession of the unoccupied land."